(No. 87076.—

THE CITY OF EAST ST. LOUIS, Appellant, v. THE EAST ST. LOUIS FINANCIAL ADVISORY AUTHORITY, Appellee.

*Opinion filed December 16, 1999.*

BILANDIC, J., dissenting.

John J. Kurowski and William D. Schultz, Jr., of The Kurowski Law Firm, P.C., of Swansea, for appellant.

James E. Ryan, Attorney General, of Springfield (Joel D. Bertocchi, Solicitor General, and Karen J. Dimond,

Assistant Attorney General, of Chicago, of counsel), for appellee.

JUSTICE HEIPLE delivered the opinion of the court:

This case presents two issues: first, whether the Financially Distressed City Law (hereinafter, the Act) (65 ILCS 5/8—12—1 *et seq.* (West 1996)) empowers a "Financial Advisory Authority" to impose a budget upon a financially distressed city after that city fails to adopt a satisfactory budget; and second, whether the East St. Louis Financial Advisory Authority (the Authority) acted in an arbitrary and capricious manner in rejecting the second of two proposed city budgets submitted by the City of East St. Louis (the City). For the reasons that follow, we hold that the Act does not empower a Financial Advisory Authority to impose a budget upon a city; however, we also hold that the Authority did not act in an arbitrary and capricious manner when it rejected the City's second proposed budget.

### BACKGROUND

Following the enactment of the Financially Distressed City Law in 1990, the City adopted an ordinance requesting that it be designated a financially distressed city under the Act. Consistent with that designation, the City thereafter has been required each year to submit its annual budget, after adoption by the City, to the Authority for approval. 65 ILCS 5/8—12—16 (West 1996).

In accordance with the statutory procedure, on November 12, 1997, the City adopted a budget for 1998 and submitted it to the Authority for its approval. On November 22, 1997, the Authority rejected the City's first proposed budget and returned it to the City for correction. The Authority listed several reasons for its rejection of the budget: (1) the City's revenue estimates failed to comply with the estimates approved by the Authority; (2) the budget failed to separate grants and special

revenues; (3) the salaries of certain city employees were improperly charged to the Motor Fuel Tax Fund; (4) the budget failed to comply with certain requirements of the federal "COPS FAST" grant program; (5) several budget items, including "electricity," "vehicle maintenance," "unemployment insurance," "overtime," and "sewer maintenance," were underfunded; and (6) the budget improperly failed to fund the position of a fire department lieutenant who was then on active military leave.

On December 7, 1997, the City adopted a revised budget and submitted that budget to the Authority for approval. On December 20, 1997, the Authority rejected the City's revised budget. According to the Authority, the revised budget still failed to fully comply with the requirements of the federal COPS FAST grant program. In particular, under the revised budget, the City proposed to fund certain vacant police officer positions in the budget while other officers would be paid with federal grant money. Thus, the City was proposing to pay eight officers with grant money while at the same time cutting back on the number of officers being paid *by the City* and using the salary savings for other purposes. This, according to the Authority, was a violation of the "maintenance of effort" requirement of the grant program and rendered the City's budget inconsistent with the City's three-year financial plan. Moreover, the Authority noted that several budget line items, including electricity, unemployment insurance, overtime, sewer maintenance, and vehicle maintenance, remained underfunded in the revised budget. The Authority stated that the underfunding of these items rendered the budget not reasonably capable of being achieved.

In addition to the above defects, the Authority alleged new problems with the City's revised budget. First, the revised budget proposed to fund $400,000 in maintenance work with sewer revenues that had never gener-

ated more than $100,000. Second, the Authority concluded that the City's proposed $200,000 reduction in the amount budgeted for the public library was unlawful because it improperly reduced the library's proportionate share of the City's personal property tax replacement funds from 23% to 7%.

At the Authority's December 20 meeting, immediately after the roll-call vote rejecting the City's second budget, the members of the Authority discussed how to proceed with respect to the City's budget. First, the Authority could simply allow its rejection of the budget to stand and take no further action. Second, the Authority could act pursuant to its statutory authority to intercept funds due to the City from the state. 65 ILCS 5/8—12—21(2) (West 1996). Third, the Authority could simply impose a budget of its own making upon the city. A copy of the Authority's proposed budget, which had already been prepared by the Authority's staff, was distributed among the Authority's members. After hearing comments from several of the Authority's directors who expressed the opinion that intercepting state payments was too harsh a remedy, the Authority unanimously voted to impose its budget on the City.

On December 24, 1997, the City filed a complaint against the authority requesting that the circuit court of St. Clair County enjoin the Authority from intercepting payments due the City from the state Treasurer, and further requesting that the court declare the Authority's imposition of a budget on the City to be "void, unconstitutional, improper and otherwise contrary to law *ab initio*." On December 30, 1997, the City obtained new counsel and filed an amended complaint. On December 31, 1997, the court entered an order whereby the parties agreed to operate under the Authority's proposed budget, except that the City was required to operate under its own proposed budget regarding the layoff of employees.

The Authority also agreed not to intercept any funds due to the City from the state Treasurer. The agreement also required the parties to continue to negotiate in good faith to obtain an approved budget.

On April 15, 1998, the City filed a four-count second-amended complaint. In count I, the City sought a declaration that the Financially Distressed City Law did not permit the Authority to impose a budget on the City. The City also requested that the Authority be enjoined from imposing its budget on the City. Count II requested that the court find that the Authority acted arbitrarily and capriciously when it rejected the City's second proposed budget. Count III, entitled "Petition for Writ of Certiorari," requested that the court review the decision of the Authority to reject the City's proposed budget and impose its own budget on the City. Count IV requested injunctive relief prohibiting the Authority and its agents from taking certain steps to implement the budget.

On April 17, 1998, the court entered an order denying the City relief, stating that the Authority had not acted arbitrarily and capriciously in rejecting the City's budget, and that the Authority had not acted beyond the scope of its powers in imposing a budget on the City. The appellate court affirmed. No. 5—98—0288 (unpublished order under Supreme Court Rule 23). We granted the City's petition for leave to appeal and now affirm in part and reverse in part.

## ANALYSIS

### I. The Imposition of Budget by the Authority

The City argues that the appellate court erred in holding that the Act permitted the Authority to impose a budget of its own making on the City. The City points out that no provision of the statute expressly confers such a power on the Authority, and further argues that it would be improper to infer such an important power from

the more general enabling language of the statute. The Authority, in contrast, argues that this court should infer the power to impose a budget from statutory language granting the Authority "all powers necessary to meet its responsibilities and to carry out its purposes and the purposes of this Division." 65 ILCS 5/8—12—6(b) (West 1996). The Authority argues that such an inference is proper in light of the broad remedial purposes of the Act.

This court has consistently held that the starting place in interpreting the meaning of a statute is to ascertain and give effect to the legislative intent in enacting the statute. See, *e.g.*, *Balmoral Racing Club, Inc. v. Illinois Racing Board*, 151 Ill. 2d 367, 390 (1992); *Fumarolo v. Chicago Board of Education*, 142 Ill. 2d 54, 96 (1990); *People v. Madison*, 121 Ill. 2d 195, 200 (1988). " ' "This is to be done primarily from a consideration of the legislative language itself, which affords the best means of [the statute's] exposition ***." ' " *Maloney v. Bower*, 113 Ill. 2d 473, 479 (1986), quoting *Franzese v. Trinko*, 66 Ill. 2d 136, 139 (1977), quoting *Western National Bank v. Village of Kildeer*, 19 Ill. 2d 342, 350 (1960). We are also mindful that "[w]e should not attempt to read the statute other than in the manner in which it was written." *Kozak v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 95 Ill. 2d 211, 215 (1983).

Thus, in determining whether the Act permitted the Authority to impose a budget on the City after the City allegedly failed to adopt a satisfactory budget on its own, we must look first to the language of the statute itself. Section 8—12—16 of the Act describes the role which the legislature intended for the Authority to have in the budgetmaking process:

"The financially distressed city shall develop, adopt and submit to the Authority *** an annual Budget for each *** fiscal year. After adoption by the city, the city shall submit each Budget to the Authority for its approval not later

than 60 days prior to the commencement of the fiscal year to which the Budget relates. The Authority shall approve or reject the Budget not later than 30 days prior to the commencement of the fiscal year. No Budget shall have force or effect without approval of the Authority. Each Budget shall be developed, submitted, approved and monitored in accordance with the following procedures:

(1) Each Budget submitted by the financially distressed city shall be based upon revenue estimates approved or prepared by the Authority ***.

(2) Each Budget shall contain such information and detail as may be prescribed by the Authority. ***

(3) The Authority shall approve each Budget if, in its judgment, the Budget is complete with respect to providing a detailed accounting of revenues and expenditures, is reasonably capable of being achieved, will meet the requirement [of being balanced] set forth in Section 8—12—14, and will be consistent with the Financial Plan in effect. Otherwise, the Authority shall reject the Budget. *** No Budget submitted by the financially distressed city shall be arbitrarily or capriciously rejected by the Authority. Any rejection by the Authority of any Budget submitted by the city shall be in writing and shall state the reasons for the rejection. In the event of rejection, the Authority may prescribe a procedure and standards for revision of the Budget by the city." 65 ILCS 5/8—12—16 (West 1996).

It is clear from the text of this statute that the General Assembly intended for the elected city government to retain its role as the body charged with crafting and adopting a budget. The statute commands the financially distressed city to "develop, adopt and submit *** an annual budget" for the Authority's review. The Authority, for its part, is given a direct command to approve the budget if it complies with the statutory requirements, and to reject the budget if it does not. Nowhere in the statute has the General Assembly even hinted that the Authority may simply take over and draft the budget itself once two proposed city budgets have been rejected. On the contrary, the statute plainly states that even after

a city's proposed budget is rejected, the budgetmaking power remains with the city. The statute provides: "In the event of rejection, the Authority may prescribe a procedure and standards for revision of the Budget *by the city*." (Emphasis added.) 65 ILCS 5/8—12—16(3) (West 1996).

In addition to the procedure described in section 8—12—16, the statute gives the Authority a powerful tool in dealing with a city that fails to submit an acceptable budget proposal. Section 8—12—21(2) of the statute provides:

> "The Authority in its sole discretion may intercept any payments that the city from time to time is entitled to receive from any funds then or thereafter held by the State Treasurer to the credit of the city or otherwise in the custody of the State Treasurer to the credit of the city, whether in or outside of the State Treasury, upon the occurrence of any of the following:
>
> ***
>
> (2) Any Financial Plan or Budget for any subsequent fiscal year is not approved by the Authority by the commencement of the fiscal year to which such Financial Plan or Budget relates, and the Authority has theretofore given written warning notice to the corporate authorities of the city, on the 15th day prior to the commencement of that fiscal year, that the Financial Plan or Budget for such fiscal year has not been approved by the Authority[.]" 65 ILCS 5/8—12—21(2) (West 1996).

In this case, the Authority declined to resort to this statutory enforcement mechanism after several of the Authority's directors expressed the view that intercepting funds would cause undue hardship for the citizens of East St. Louis. That decision was well within the discretion of the Authority. However, having rejected the enforcement mechanism provided by the General Assembly, the Authority did not thereby free itself to craft an alternative remedy not provided for by the statute.

Attempting to overcome the clear absence of a statu-

tory provision expressly conferring a budgetmaking power upon the Authority, the Authority relies heavily upon section 8—12—6 of the statute, which sets forth the purposes and powers of the Authority. That section provides, in its entirety:

"(a) The purposes of the Authority shall be to provide a secure financial basis for and to furnish assistance to a financially distressed city to which this Division is applicable as provided in Section 8—12—4, and to request the Illinois Development Finance Authority to issue its Obligations on behalf of and thereby provide financial aid to the city in accordance with applicable provisions of the Illinois Development Finance Authority Act, so that the city can provide basic municipal services within its jurisdictional limits, while permitting the distressed city to meet its obligations to its creditors and the holders of its notes and bonds.

(b) Except as expressly limited by this Division, the Authority shall have all powers necessary to meet its responsibilities and to carry out its purposes and the purposes of this Division, including, but not limited to, the following powers:

(1) To provide for its organization and internal management, and to make rules and regulations governing the use of its property and facilities.

(2) To make and execute contracts, leases, subleases and all other instruments or agreements necessary or convenient for the exercise of the powers and functions granted by this Division.

(3) To approve all loans, grants, or other financial aid from any State agency.

(4) To appoint officers, agents, and employees of the Authority, define their duties and qualifications and fix their compensation and employee benefits.

(5) To engage the services of consultants for rendering professional and technical assistance and advise on matters within the Authority's power.

(6) To pay the expenses of its operations.

(7) To determine, in its discretion but consistent with the requirements of this Division, the terms and conditions of any loans it may make to the financially distressed city.

(c) Any loan repayments received by the Authority from the distressed city may be deposited by the Authority into a revolving fund under the control of the Authority. Money in the revolving fund may be used by the Authority to support activities leading to a restructuring of the distressed city's debt and may be pledged by the Authority as security for any new debt incurred by the distressed city with the approval of the Authority.

(d) From any funds appropriated to the Authority for the purpose of making a loan to a distressed city, the Authority may expend not more than $250,000 for the expenses of its operations in the fiscal year in which the appropriation is made." 65 ILCS 5/8—12—6 (West 1996).

The Authority argues that the statutory language "all powers necessary to meet its responsibilities and to carry out its purposes and the purposes of this Division" should be interpreted to confer upon the Authority the power to impose a budget where a city has failed to draft a satisfactory budget on its own. The Authority specifically emphasizes the statutory phrases "[e]xcept as expressly limited by this Division" and "including, but not limited to." According to the Authority, this statutory language, when read in conjunction with the absence of a clear prohibition of budgetmaking by the Authority, is broad enough to evince an intent by the legislature to authorize the Authority to impose its budget on the City under the facts of this case.

We decline to adopt the Authority's extraordinary construction of this statutory language. The doctrine of *ejusdem generis* provides that when a statute lists several classes of persons or things but provides that the list is not exhaustive, the class of unarticulated persons or things will be interpreted as those "others such like" the named persons or things. *Board of Trustees of Southern*

*Illinois University v. Department of Human Rights*, 159 Ill. 2d 206, 211 (1994); *Coldwell Banker Residential Real Estate Services of Illinois, Inc. v. Clayton*, 105 Ill. 2d 389, 396 (1985); *Farley v. Marion Power Shovel Co.*, 60 Ill. 2d 432, 436 (1975). Here, the General Assembly expressly listed six specific types of powers which it believed the Authority would require in order to carry out its purposes and the purposes of the statute. These enumerated powers deal with the Authority's power to run its day-to-day operations, to execute legal documents, to hire employees and consultants, and to pay the Authority's bills. The power of the Authority to bypass the elected governance of a city, to draft a budget for that city, and to require the city to live under the Authority's budget is simply not of like kind. Accordingly, the general language of section 8—12—6 of the Act cannot fairly be read to confer upon the Authority the power to impose a budget upon a city.

In reaching a contrary conclusion, the appellate court relied upon this court's decision in *East St. Louis Federation of Teachers, Local 1220 v. East St. Louis School District No. 189 Financial Oversight Panel*, 178 Ill. 2d 399 (1997). The appellate court's reliance on *Local 1220* was misplaced. At issue in *Local 1220* was the authority of a school district financial oversight panel to order a school district not to renew the contract of its superintendent. In that case, this court held that the panel had acted within its authority under a statute which authorized the panel to approve or reject contracts made by the school board. *Local 1220*, 178 Ill. 2d at 409-10. Thus, by refusing to approve a renewal of the superintendent's contract, the oversight panel was simply exercising a power expressly granted to it by the legislature. The facts of the instant case are inapposite. Here, the Authority did far more than exercise an express power. Rather, it exercised its express power to reject the City's proposed budget, but then went further and drafted, adopted, and

imposed a budget of its own making upon the City. For *Local 1220* to be even arguably analogous to the instant case, the oversight panel would have had to reject the superintendent's contract, and then gone out and hired a new superintendent on its own. As the facts of that case were otherwise, however, *Local 1220* provides no authority for the appellate court's holding in the instant case.

In reaching our conclusion today that the Authority exceeded its statutory mandate by imposing a budget upon the City of East St. Louis, this court is not unmindful of the serious financial difficulties which the City of East St. Louis has experienced in recent years. Nor do we question the good faith of the members of the Authority who believed that the imposition of a budget drafted by the Authority was the most expedient solution to a difficult financial situation and would be in the best interests of the citizens of East St. Louis. Nevertheless, whatever the wisdom of a law that would permit the Authority to impose a realistic budget upon a city that has failed or refused to do so, the power to enact such a law lies not with the Authority, nor even with this court. Rather, as this court has consistently and recently noted:

"It is the province of the legislature to enact laws; it is the province of the courts to construe them. Courts have no legislative powers; courts may not enact or amend statutes. A court cannot restrict or enlarge the meaning of an unambiguous statute. The responsibility for the justice or wisdom of legislation rests upon the legislature. [Citations.] A court must interpret and apply statutes in the manner in which they are written. A court must not rewrite statutes to make them consistent with the court's idea of orderliness and public policy. [Citation.]" *Henrich v. Libertyville High School*, 186 Ill. 2d 381, 394-95 (1998).

Thus, where the legislature has not chosen to invest the Authority with the power to impose a budget upon a city, it would be wholly improper for this court to substitute its judgment for that of the only branch of government constitutionally authorized to make such choices.

## II. The Authority's Rejection of the City's Budget

The City next contends that the lower courts erred in finding that the Authority did not act arbitrarily and capriciously when it rejected the City's second proposed 1998 budget. In *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 505-06 (1988), this court discussed the proper analysis for determining whether the action of an agency is arbitrary and capricious. We wrote:

"While it is probably not possible to enumerate all the kinds of acts or omissions which will constitute arbitrary and capricious conduct, the following guidelines apply. Agency action is arbitrary and capricious if the agency: (1) relies on factors which the legislature did not intend for the agency to consider; (2) entirely fails to consider an important aspect of the problem; or (3) offers an explanation for its decision which runs counter to the evidence before the agency, or which is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. [Citation.] While an agency is not required to adhere to a certain policy or practice forever, sudden and unexplained changes have often been considered arbitrary. [Citation.] The standard is one of rationality. The scope of review is narrow and the court is not, absent a 'clear error of judgment' [citation], to substitute its own reasoning for that of the agency." *Greer*, 122 Ill. 2d at 505-06.

In the instant case, the City argues that the Authority's rejection of the revised budget was arbitrary and capricious because the City had corrected all of the defects of which the Authority had complained with respect to the first budget. The City makes the related argument that it was arbitrary and capricious for the Authority to raise new objections to items in the City's revised budget after the Authority had failed to object to those same items in the original budget.

In response, the Authority argues that while the City did fix some of the problems that were present in the first budget, certain other defects remained unsolved. In

particular, both the City's original and revised budgets failed to comply with the "maintenance of effort" requirement of the federal COPS FAST grant program. In addition, the Authority maintains that certain budget items, including "electricity," "vehicle maintenance," "unemployment insurance," "overtime," and "sewer maintenance," were underfunded in the City's first budget, and remained underfunded in the City's revised budget.

The Authority also states that when it reviewed the City's revised budget, it noticed that the City was planning to fund $400,000 in maintenance work with sewer revenues that had never generated more than $100,000. The Authority argues that it was obligated to object to this defect in the budget, regardless of when it was first discovered, because the Authority is statutorily required to approve only those budgets which comply with the criteria set forth in section 8—12—16 of the statute.

After reviewing both sides' arguments on the validity of the reasons for the rejection of the City's revised budget, we conclude, as did the courts below, that: (1) the Authority did not rely on factors the legislature did not intend, (2) the Authority did not fail to consider an important aspect of the problem, and (3) the Authority's explanation for its decision does not run counter to the evidence, nor is it so implausible that it cannot be ascribed to a difference in view. Moreover, we agree that the Authority did not act improperly when it objected to a flaw in the revised budget even after it failed to object to that same flaw in the original budget. While it would, of course, have been preferable if the Authority had discovered and pointed out every flaw contained in the original budget when it first rejected that budget, the Authority's failure to do so did not render its subsequent objection arbitrary or capricious, particularly when considered in the context of the other specific complaints

made by the Authority regarding the revised budget. Accordingly, we hold that the Authority did not act in an arbitrary or capricious manner when it rejected the City's revised 1998 budget.

## CONCLUSION

For the reasons expressed above, we reverse the holdings of the appellate and circuit courts that the Financially Distressed City Law conferred upon the Authority the power to impose a budget upon the City. We affirm, however, the appellate court's and the circuit court's holdings that the Authority did not act in an arbitrary or capricious manner in rejecting the City's revised 1998 budget.

*Appellate court judgment affirmed*
*in part and reversed in part;*
*circuit court judgment affirmed*
*in part and reversed in part.*

JUSTICE BILANDIC, dissenting:

I respectfully dissent from the portion of the majority opinion that holds that the Authority did not have the power to adopt a 1998 budget for the City under the facts of this case.

The Financially Distressed City Law (the Act) (65 ILCS 5/8—12—1 *et seq.* (West 1996)) requires the City to submit its proposed budget *no later than 60 days prior to the commencement of its fiscal year.* See 65 ILCS 5/8—12—16 (West 1996). The City's fiscal year is the calendar year. The City's budget for the period commencing January 1, 1998, and ending December 31, 1998, is involved in this case. The City adopted its first proposed 1998 budget and submitted it to the Authority for approval on November 12, 1997. Incredibly, the City adopted this budget 10 days later than required by the Act. After adopting an ordinance requesting that it be designated a financially distressed city under the Act, the City failed

to comply with the provisions of the Act. Here, the Authority did what the City should have done—it adopted a timely and balanced budget. The Authority did so *only* after two failed attempts by the City.

The majority erroneously decides that the Act does not allow the Authority to impose a budget on the City under the facts of this case. The Act gives the Authority "all powers necessary to meet its responsibilities and to carry out its purposes and the purposes of [the Act]." See 65 ILCS 5/8—12—6(b) (West 1996). With less than two weeks remaining in 1997, the Authority properly exercised these powers to rescue the City from its inept financial performance. Only harm could be visited on the citizens and taxpayers of the City without a timely approved budget.

The broad language of the Act shows an intent by the legislature to give the Authority the power to impose a budget on the City. The provisions of the Act reveal that the legislature deemed it critical for a financially distressed city to have a balanced budget. As the circuit court found, prohibiting the Authority from imposing a budget "would be to limit their choice to either throwing the City into the same financial chaos and distress which the Law was enacted to prevent or compromising the City's financial integrity which is contrary to the legislative intent." The Authority was acting within the broad powers that the Act provides to it. The Authority determined that imposing a budget on the city was the best way "to provide a secure financial basis for the continued operation" of the City. See 65 ILCS 5/8—12—2(b) (West 1996).

Moreover, the Act should be read as a whole, with all relevant parts considered. See *Kraft, Inc. v. Edgar*, 138 Ill. 2d 178, 189 (1990). Section 8—12—6(b) states that the Authority shall have all powers necessary to meet its responsibilities and to carry out its purposes and the

purposes of the Act "including, but not limited to" certain enumerated powers. The word "including" is a term of enlargement, not limitation. *People v. Valley Steel Products Co.*, 71 Ill. 2d 408, 419 (1978). The term should not be construed to mean that those things not enumerated are excluded, where such a construction would override the intent of the legislature. See *Valley Steel Products Co.*, 71 Ill. 2d at 419. The "including, but not limited to" language of the Act shows that the legislature contemplated that the Authority has powers other than the powers specifically enumerated. Indeed, two of the provisions in section 8—12—6(b) describe certain enumerated powers by referencing the broad power that the Act provides to the Authority. See 65 ILCS 5/8—12—6(b)(2), (b)(5) (West 1996). Thus, the fact that the Act does not explicitly grant the Authority the power to impose a budget is not determinative. The legislature granted the Authority "all powers necessary" to carry out the Act's purposes. The legislature stated that a purpose of the Act is "to provide a secure financial basis for the continued operation of a financially distressed city." 65 ILCS 5/8—12—2(b) (West 1996). A legitimate budget is necessary to provide the City with a secure financial basis.

The legislative history also reveals that the Act was intended to correct the problems of financially distressed cities. Representative Stephens made the following comments in support of the Act:

"If you are going to give money to people who have been irresponsible with it in the past, for once and for all let's simply say 'no more.' Now if you enter into a financial agreement, we will have an oversight committee that has to give a stamp of approval. Two of the citizens of that five man oversight committee will reside in the city, three will not. They will be put there to watch the taxpayers' dollars, because they deserve to be watched. If the mayor continues his ways of the past, he will lose all authority, because we

are saying to him, 'no more.' These are strings. These are ropes. These are iron clad guarantees to the taxpayers throughout the State of Illinois that we are fed up with irresponsibility." 86th Ill. Gen. Assem., House Proceedings, June 29, 1990, at 220 (statements of Representative Stephens).

Representative McNamara added the following:

"[T]he most important thing we are doing during this Session is what we do here tonight. That is, to revitalize an economy to effectively bring financial ability into a community and to help for the future of East St. Louis and all other communities that may need *** help. And not to do it by the unspent or the reckless spending of dollars, but to do it by the ability to have good common fiscal management under a good loan package." 86th Ill. Gen. Assem., House Proceedings, June 29, 1990, at 225 (statements of Representative McNamara).

These comments support that the legislature intended to give the Authority broad powers to rectify the financial problems of the City. Here, the Authority determined that the City appeared unwilling to adopt a legitimate budget. Consequently, the Authority voted to adopt its own budget for the City. The legislature gave the Authority broad powers to effectuate the purposes of the Act. Under these broad powers, the Authority was able to impose its budget as a means to provide a secure financial basis for the continued operation of the City.

For the foregoing reasons, I would hold that the Authority properly imposed a budget on the City pursuant to the Financially Distressed City Law. I therefore respectfully dissent.