(No. 99332.—

COMPREHENSIVE COMMUNITY SOLUTIONS, INC., Appellant, v. ROCKFORD SCHOOL DISTRICT NO. 205 *et al.*, Appellees.

*Opinion filed September 22, 2005.*

David J. Chizewer and Maureen E. Merin, of Goldberg, Kohn, Bell, Black, Rosenbloom & Moritz, Ltd., of Chicago, and Thomas Wilson, of Sorling, Northrup, Hanna, Cullen & Cochran, Ltd., of Springfield, for appellant.

Hinshaw & Culbertson, of Chicago (Thomas J. Lester and Nancy G. Lischer, of counsel), for appellee Rockford School District No. 205.

Mary Patricia Kerns, Assistant Attorney General, of Chicago, for appellee Illinois State Board of Education.

Elizabeth A. Evans, of Chicago, for *amicus curiae* Illinois Network of Charter Schools.

JUSTICE FITZGERALD delivered the opinion of the court:

Comprehensive Community Solutions, Inc. (CCS), submitted a charter school proposal to the Rockford board of education (board). The board rejected the proposal, and the Illinois State Board of Education (State Board or ISBE) refused to disturb that decision. The circuit court of Sangamon County confirmed the State Board's decision, and the appellate court affirmed the trial court's decision. 351 Ill. App. 3d 1109. CCS appealed. For the reasons that follow, we affirm.

## BACKGROUND

In 1996, faced with mounting calls for public education reform, the General Assembly adopted the Charter Schools Law. See 105 ILCS 5/27A—1 et seq. (West 2002). The legislature acknowledged, "There are educators, community members, and parents in Illinois who can offer flexible and innovative educational techniques and programs, but who lack an avenue through which to provide them within the public school system." 105 ILCS 5/27A—2(a)(2) (West 2002). The Charter Schools Law seeks to expand educational opportunities for "at-risk pupils"—pupils "who, because of physical, emotional, socioeconomic, or cultural factors, [are] less likely to succeed in a conventional educational environment." 105 ILCS 5/27A—3 (West 2002). To ensure this purpose is met, the General Assembly indicated that the statute "should be interpreted liberally to support the findings and goals of this Section and to advance a renewed commitment by the State of Illinois to the mission, goals, and diversity of public education." 105 ILCS 5/27A—2(c) (West 2002).

A charter school is a public school organized and operated as a nonprofit entity independent of, but funded by, the school district in which it operates. A party seeking to establish a charter school must submit a proposal

to both the State Board and the local school board in the form of a proposed contract. 105 ILCS 5/27A—7(a) (West 2002). There are 15 requirements for a charter school proposal, including "[e]vidence that the terms of the charter as proposed are economically sound for both the charter school and the school district." 105 ILCS 5/27A—7(a)(9) (West 2002).

As part of the contract, the party proposing the charter school and the local school board must agree on funding and any services that the school district will provide to the charter school. 105 ILCS 5/27A—11(b) (West 2002). A major source of this funding is so-called per capita student tuition—money provided from the state to school districts according to the number of students and their average daily attendance. See 105 ILCS 5/18—8.05(C) (West 2002). The Charter Schools Law provides: "In no event shall the funding be less than 75% or more than 125% of the school district's per capita student tuition multiplied by the number of students residing in the district who are enrolled in the charter school." 105 ILCS 5/27A—11(b) (West 2002). The legislature, however, intended that such "funding and service agreements *** shall be neither a financial incentive nor a financial disincentive to the establishment of a charter school." 105 ILCS 5/27A—11(b) (West 2002). Financial incentives instead come from the state: the statute offers "transition impact aid" to school districts that have approved charter schools (105 ILCS 5/27A—11.5(1) (West 2002)), as well as grants (105 ILCS 5/27A—11.5(2) (West 2002)) and interest-free loans (105 ILCS 5/27A—11.5(3) (West 2002)) to charter schools for educational materials and facilities.

After receiving a charter school proposal, the local school board must convene a public meeting to obtain information relevant to the proposal. 105 ILCS 5/27A—8(c) (West 2002). Within 30 days of that meeting, the lo-

cal school board must convene another public meeting and vote to either grant or deny the proposal. 105 ILCS 5/27A—8(e) (West 2002). In evaluating a charter school proposal, the local school board must give preference to proposals that "(1) demonstrate a high level of local pupil, parental, community, business, and school personnel support; (2) set rigorous levels of expected pupil achievement and demonstrate feasible plans for attaining those levels of achievement; and (3) are designed to enroll and serve a substantial proportion of at-risk children." 105 ILCS 5/27A—8(a)(1) through (a)(3) (West 2002).

The local school board must then report its decision to the State Board. 105 ILCS 5/27A—8(f) (West 2002); 23 Ill. Adm. Code § 650.30 (1998). If the local board grants the proposal, and the State Board determines that the proposal complies with statutory requirements, the State Board must certify the proposal, creating the charter school. 105 ILCS 5/27A—8(f) (West 2002); 23 Ill. Adm. Code § 650.40(a) (1998). If the local board denies the proposal, the party proposing the charter school may appeal that decision to the State Board. 23 Ill. Adm. Code § 650.60(a) (1998). The State Board "may reverse a local board's decision if the State Board finds that the charter school or charter school proposal is (i) in compliance with this Article, and (ii) is in the best interests of the students it is designed to serve." 105 ILCS 5/27A—9(e) (West 2002). If the State Board reverses the local school board's decision to deny a proposal, the State Board "shall act as the authorized chartering entity for the charter school" and perform all the functions that the local school district would perform with respect to the charter school. 105 ILCS 5/27A—9(f) (West 2002).

CCS, a self-titled "community change agent," operates YouthBuild Rockford, a branch of the National YouthBuild program and a part of the AmeriCorps

national service movement. YouthBuild Rockford offers 16- to 24-year-old unemployed high school dropouts a chance to earn a high school degree while they acquire vocational skills. Participants in this program alternate their time between school and jobsites, where they rehabilitate or construct housing for low income and homeless people in the Rockford area.

In 2001, CCS submitted a proposal for a YouthBuild Rockford Charter School. CCS sought a five-year charter to serve 75 students between the ages 17 and 21 in 2002 and as many as 150 students by 2006. The proposed charter school would help at-risk and out-of-school students make the transition from "street to school" and "street to work" with educational, vocational, and social support. According to CCS, the proposed charter school differed from an alternative high school because it would provide both academic instruction and job training. Under the proposal, the charter school also would provide a stipend of $4,998 per student in 2002, "depending on the availability of funding." The stipend would increase to $6,426 by 2006.

The total budget for the charter school's first year was $1.6 million. Part of the charter school's revenues would be provided by the board in "an amount equal to the current fiscal year per capita student expenditure," $7,471 in 2002, multiplied by the number of students. CCS assumed 85% average daily attendance. The proposal further stated:

> "The proposed charter school is considered economically sound for both the charter school and the District, since the District is not presently serving the students proposed to be served by the Charter School, and is therefore not receiving per pupil revenue for those students. This proposal contemplates that the Charter School will receive 100% of the District's per pupil expenditure for each student enrolled. Further, the Charter School will negotiate other services *** separately."

The proposal indicated that the board would provide special education services to students of the charter school "on the same basis it does for Rockford School District students."

The proposal was referred to the board's charter school advisory committee. Thomas Hoffman, finance director for the district, advised the committee that the district had cash flow problems and that it would need to borrow money to support the proposal. The committee's report of its August 8, 2001, meeting states:

"Committee members expressed concerns about the economic feasibility of the proposal. This was due in part to the negative impact on the school district's budget. The school board has adopted a balanced budget policy. The charter school proposal if recommended as submitted would cause a deficit. A decision on this aspect of the proposal was delayed until further negotiations could be held."

The committee felt "a responsibility to make sure that they do not saddle the School District with a liability," and its August 14, 2001, executive summary reflected these concerns:

"The applicant and members of the Committee are still discussing the financial plan for the proposed charter school. A recommendation from the Committee to enter into a contract is dependant upon the successful conclusion of those discussions and a financial plan that will minimize any adverse fiscal impact on both organizations."

During these discussions CCS stated that the proposed charter school would provide equal access for non-dropout students and asked that the district pay for special education services. In an August 19, 2001, memo to Joyce Price, chief education officer for the district, CCS clarified other modifications it would make to its original proposal. CCS assumed that it would receive transition impact aid from the state and that it would maintain 90% average daily attendance, which would correspondingly increase its per capita funding over the

funding it would receive at 85% average daily attendance. As an alternative to its demand for 100% per capita funding, CCS proposed a variable funding rate starting at 88% in the first year and moving to 95% in the fifth year of the charter. CCS never backed away from its original demand, however: "If this proposal is not accepted and recommended to the School Board, then it is withdrawn and our original proposal stands."

The proposal was next discussed at two public meetings of the board. The minutes of the August 14, 2001, meeting indicate:

"The [charter school] Committee has exercised due diligence in the review of this application; however, the financial section of the application is still in negotiation. The Committee has evaluated the application against the fifteen requirements of state law and, based upon that evaluation, the Committee will recommend approval at the next board meeting, pending a successful outcome of the outstanding issue of economic feasibility."

The committee ultimately recommended that the board approve the proposal at 75% per capita funding, which CCS later labeled "an inadequate financing plan" to which it never agreed. On August 28, 2001, the board discussed and denied the proposal by a 3-3 vote.

The local board sent a report to the State Board, which noted the following "deficiencies" in the charter school proposal:

"1. YouthBuild would target the type of student now being served at the Roosevelt Alternative High School and would be duplicative of services provided therein;

2. Adults who have dropped out cannot be considered to be at-risk pupils as defined in § 27A—4 of the School Code. This section implies that charter schools are intended to serve children who are currently enrolled;

3. YouthBuild will offer another program for people who have failed, in some cases repeatedly, and dropped out. Indeed, the YouthBuild program may be an incentive to drop out in order to receive the weekly stipend rather than

enrolling in the adult education program at Roosevelt Alternative High School;

4. Curriculum and its implementation have not been set forth with adequate specificity;

5. There was no showing what the rate of success, *e.g.* diploma or GED, was for this type of program; and

6. Even at the minimal funding level, Rockford School District would sustain a loss of $30,717.00 which would not include the cost of special education services for which it would be responsible. Given the dire financial situation, the Rockford School District cannot take on more debt."

In a September 17, 2001, letter announcing its decision to appeal the board's decision, CCS asked the State Board to "review the recordings of the two applicable Board meetings at which discussion was held. A review of these proceedings will demonstrate that the vote to deny this application was primarily reflective of one issue—funding."

The State Board's appeal panel reviewed the local board's decision. At a November 7, 2001, hearing, CCS Executive Director Kerry Knodle stated that if the local board had accepted the proposal recommended by its charter school advisory committee, CCS would have declined to proceed "simply because the budget they would have approved at 75 percent would not have worked for us." Knodle clarified, "What's technically on the table in our proposal as far as we're concerned at this point is the 100 percent number." At that hearing, board attorney James Hess acknowledged that because of his school district's financial difficulties, the local school board could not approve this or any other charter school proposal "[i]f it results in a deficit." Hess bluntly stated, "We are trying to put our house in order. We don't need this [proposal] right now." Even at the variable funding rate, the board would still encounter a $483,234 deficit. Hess asked, "From whom do we take it? Where do we get it? Must we borrow it so [Knodle] can have his school?"

On February 8, 2002, the appeal panel issued its recommendation to the State Superintendent of Education. See 23 Ill. Adm. Code § 650.60(d) (1998). The appeal panel initially discussed the Charter Schools Law, then turned to the reasons enunciated by the board in denying the proposal. The appeal panel disagreed with the local board on each of the six grounds it mentioned in denying the charter, particularly on the issue of funding.

The appeal panel noted, "If YouthBuild Rockford agreed to a 75% per capita tuition rate, the cumulative effect over the first five years of the charter would be $30,717 more paid to the charter school than would be received by the district from general state aid and transition impact aid payments," which represented less than one-tenth of one percent of the amount budgeted by the district for educational expenditures in 2002. The appeal panel further noted that its staff found possible errors in the figures used by the local board to determine the proposal's impact. Using the enrollment numbers provided in the proposal, and assuming that state aid payments and the district's budget remained constant and that the legislature would provide for transition impact aid, the staff determined that the five-year net deficits created by a YouthBuild Rockford charter school would range from $2.57 million at a 100% per capita funding rate to $1.87 million at an 80% per capita funding rate. According to the appeal panel, "these figures represent .27% and .20% respectively of the five-year cumulative educational budgets proposed by Rockford."

The appeal panel asserted that it did not

"minimize the impact of any potential loss of revenue from Rockford's educational fund. However, a revenue loss to the district is inescapable under the Charter Schools Law, but is necessary to serve the law's goal 'to provide parents and pupils with expanded choices within the public school system.' [Citation.] By funding charter schools through per

capita payments from the district, the Charter Schools Law recognizes that the funding in essence 'belongs to' the student and the student's parents, and may be spent in a charter school rather than in the district's schools if the parents see fit. So viewed, the creation of a charter school 'costs' a district nothing. It is only when individual parents decide that the charter school can offer a better education and choose to enroll their children in the charter school that the funding flows from the district to the charter school. If the parents of Rockford students decide to exercise this option, they should have the right to do so."

The appeal panel found that the proposal complied with the Charter Schools Law and that the proposal would "clearly" be in the best interests of Rockford students. The panel concluded that the State Board should reverse the local board's decision and grant a charter to YouthBuild Rockford. The State Superintendent seconded this recommendation, and sent it to the State Board for a final decision. See 23 Ill. Adm. Code § 650.60(d)(1) (1998).

The State Board requested additional information from both CCS and the local board. See 23 Ill. Adm. Code § 650.60(b) (1998). Specifically, the State Board asked the local board to identify "the specific hardships placed on [the school district] should this charter be approved" and "specific programs at [the school district] that will be in jeopardy should this charter be approved." In its February 27, 2002, response, the board stated it would incur a five-year deficit of $30,717 at a 75% per capita funding rate, a deficit of $483,234 at the variable 88% to 95% funding rate once advanced by CCS, and a deficit of $676,639 at a 100% funding rate. The board indicated that the district's deficit stood at $32.65 million, which, according to an independent audit, cast "substantial doubt about the District's ability to continue as an ongoing concern." The board reported that it was considering $12.18 million in budget cuts, pending a vote on a referendum to repay $28 million to tax objectors by issu-

ing bonds over a 10-year period. If the referendum failed, the local board would be considering an additional $9.81 million in budget cuts. The additional cuts would include closing three schools, implementing a six-period day for 10 secondary schools, and eliminating various administrative positions and unspecified athletic programs, as well as funding for tutorials, textbooks, and computers. According to the board, "These proposed cuts will adversely affect the education of all students especially those enrolled in the twenty-three schools on the academic watch list."

At a special meeting on the charter school proposal, the State Board again requested additional information from the parties. In its March 29, 2002, response, CCS indicated that its stipends historically came from federal grants. CCS anticipated that these grants would continue. In its March 28, 2002, response, the local board again stated that at 100% per capita funding, it would encounter a deficit of $676,639 plus $360,724 in special education services. Thus, the board projected that its total five-year deficit as a result of the charter school would be $1.03 million. In light of the $12.2 million in budget cuts that the local board had just approved, as well as outstanding obligations to repay $55 million in tax anticipation warrants and $31 million in tax objections, the board asserted that "it is apparent that the [local board] cannot take on new debt." That is, to pay for the charter school, the local board would have to cut $1.03 million in existing programs. According to the board, "To require further sacrifices, to fund YouthBuild is not economically or educationally sound."

On May 16, 2002, the State Board upheld the local board's decision by a 4-4 vote. The minutes of this meeting contain comments from each board member who voted no:

> "Mrs. Rogers commented that she voted no because she believes that most charter schools fail because of lack of

financing and she does not want students put in jeopardy because of this problem.

Mr. Sandsmark commented that he voted no because to him this is an economic issue. He said that the Rockford School District has had financial problems for as long as the thirty years that he has lived in the area. He stated that the school district is starting to move in the right direction and he believes that they don't need one more issue to deal with at this time.

Dr. Steiner commented that she voted no because of the financial issue and she believes that the State Board should not go against the local board's control.

Mrs. Turkal commented that she voted no because of the current economic problems that the Rockford School District has and she noted that she believes the district has adequate programs in place to meet the needs of students."

The State Board memorialized its decision in a short "FINAL DECISION" denying CCS's appeal because "[t]he proposed charter school is not economically sound for Rockford School District 205 in view of the serious financial problems that currently exist in the district."

CCS filed a judicial review complaint. On January 23, 2003, the trial court remanded this matter, ordering the State Board to "set forth in its decision what evidence the Board accepted, what evidence it may have rejected and what evidence may or may not have been contrary to the manifest weight of the evidence." The trial court stated, "The appeal panel in this matter did make findings, but this Court is unable to determine to what extent those findings were accepted or rejected by the Board, and if rejected by the Board, why they were rejected by the Board."

On June 17, 2003, the State Board specified that it denied CCS's appeal for three reasons:

"(1) board members were concerned that the charter school proposal had not adequately shown that it was economically sound for the charter school and the school district;

(2) board members reviewed additional material such as an independent financial analysis by ISBE staff of costs and budget impact; and

(3) board members expressed reservations that the charter school was in the best interests of the students it was designed to serve."

The State Board accepted evidence that the district was in grave financial condition, but rejected evidence that the charter school proposal was fiscally sound for itself and the district. The parties had presented varying figures regarding the impact of the proposal on the district, but

"[e]ven despite the ISBE staff's additional review and analysis of the financial soundness of the proposal, there remained considerable confusion over which figures apply to which funding level (whether at the minimum 75% level, a variable level ranging from 88% in the first year to 95% in the fifth year, or at the maximum 100% level), and indeed which funding level was being sought by CCS ***. Finally, based on the uncertain impact of an insufficiently clear charter school proposal upon a school district already in grave financial condition and in turn upon the proposed charter school itself, the board members found that the charter school proposal was not in the best interests of the students it was designed to serve."

The trial court confirmed the decision of the State Board, and CCS appealed.

The appellate court affirmed the decision of the trial court. The appellate court initially stated that under the Administrative Review Law, a reviewing court considers the decision of the agency, not the trial court. 351 Ill. App. 3d 1109, 1113. Further, contrary to CCS's argument, a reviewing court considers the decision of the agency, not a subordinate hearing body of the agency. 351 Ill. App. 3d at 1114.

"Here, ISBE is the final decisionmaker on the issue of whether to grant or deny a charter-school proposal. Although ISBE may delegate to staff to hear oral presentations and submit recommendations to the State Superin-

tendent of Education, it is ISBE's duty to take the findings and recommendations and make a final decision. It is that decision that is subject to judicial review under the Administrative Review Law." 351 Ill. App. 3d at 1115.

The appellate court then sketched the mechanics of the Charter Schools Law and noted that a charter school proposal must include evidence that the proposal is economically sound for the school and the school district. 351 Ill. App. 3d at 1117. The appellate court continued:

"CCS appears to argue that if other relevant factors outweigh the financial impact on the school district, the charter-school proposal must be accepted. However, the Charter Schools Law does not require such blanket acceptance of proposals. Instead, evidence must be shown that the proposal is economically sound for both the charter school and the school district. Such evidence must realistically require consideration of the school district's finances. *** We find ISBE's focus on the School District's finances was a valid factor to consider and did not violate the express goals of the Charter Schools Law." 351 Ill. App. 3d at 1117-18.

Because the State Board considered the economic impact the proposal would have on the charter school and the school district, and it considered the best interests of the district's students, it had examined the statutory factors. 351 Ill. App. 3d at 1119. The appellate court outlined the financial information produced by the school district. 351 Ill. App. 3d at 1119. The appellate court then observed that the State Board found that the proposal was not economically sound for the school district, "a necessary requirement considering the large expenditure of public funds and the state of education spending in Illinois," and consequently not in the best interests of the students. 351 Ill. App. 3d at 1119. The appellate court could not conclude that the State Board's decision was clearly erroneous. 351 Ill. App. 3d at 1120.

We allowed CCS's petition for leave to appeal. See 177 Ill. 2d R. 315(a). We granted the Illinois Network of

Charter Schools leave to file a brief in support of CCS. See 155 Ill. 2d R. 345.

## ANALYSIS

The Charter Schools Law provides that the State Board may reverse a local school board's decision to deny a charter school proposal if the State Board finds that the charter school proposal "(i) is in compliance with this Article, and (ii) is in the best interests of the students it is designed to serve." 105 ILCS 5/27A—9(e) (West 2002). The State Board's decision is subject to judicial review under the Administrative Review Law. 105 ILCS 5/27A—9(e) (West 2002).

The Administrative Review Law provides that judicial review of an administrative agency decision "shall extend to all questions of law and fact presented by the entire record before the court." 735 ILCS 5/3—110 (West 2002). The standard of review, "which determines the degree of deference given to the agency's decision," turns on whether the issue presented is a question of fact, a question of law, or a mixed question of law and fact. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 390 (2001). An agency's conclusion on a question of law is reviewed *de novo. Branson v. Department of Revenue*, 168 Ill. 2d 247, 254 (1995). A reviewing court is not bound by an agency's interpretation of a statute (*Envirite Corp. v. Illinois Environmental Protection Agency*, 158 Ill. 2d 210, 214 (1994)), but the agency's interpretation remains relevant where there is a reasonable debate about the meaning of the statute (*Harrisonville Telephone Co. v. Illinois Commerce Comm'n*, 212 Ill. 2d 237, 247 (2004)). An agency's conclusion on a question of fact is reviewed with more deference. See 735 ILCS 5/3—110 (West 2002) ("The findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct"). A reviewing court does not reweigh the evidence

before the agency; instead, it simply determines whether the agency's decision is against the manifest weight of the evidence. *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992).

A mixed question of law and fact asks the legal effect of a given set of facts. See *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 205 (1998). That is, in resolving a mixed question of law and fact, a reviewing court must determine whether established facts satisfy applicable legal rules. See *AFM Messenger*, 198 Ill. 2d at 391, quoting *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19, 72 L. Ed. 2d 66, 80 n.19, 102 S. Ct. 1781, 1790 n.19 (1982). An agency's conclusion on a mixed question of law and fact is reviewed for clear error. *City of Belvidere*, 181 Ill. 2d at 205; *Carpetland U.S.A., Inc. v. Illinois Department of Employment Security*, 201 Ill. 2d 351, 369 (2002). Such review is significantly deferential to an agency's experience in construing and applying the statutes that it administers. See *AFM Messenger*, 198 Ill. 2d at 393-94. Thus, "when the decision of an administrative agency presents a mixed question of law and fact, the agency decision will be deemed 'clearly erroneous' only where the reviewing court, on the entire record, is 'left with the definite and firm conviction that a mistake has been committed.' " *AFM Messenger*, 198 Ill. 2d at 395, quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 92 L. Ed. 746, 766, 68 S. Ct. 525, 542 (1948).

CCS argues that this case involves a question of law: "The question of the relative importance of a district's finances in determining whether or not a charter school proposal is in compliance with the Charter School [*sic*] Law requires a pure consideration of the terms of the law itself." Thus, CCS asserts, our review is *de novo*. The State Board argues that its decision presents a mixed question of law and fact and that the clearly erroneous

standard of review applies. The local board argues that the clearly erroneous standard is inappropriate because certain facts remain disputed. Accordingly, the board contends, our review is *de novo* on issues of law; on issues of fact, we must determine simply if the agency's decision was against the manifest weight of the evidence.

The central issue in this case involves the State Board's decision to uphold the local board's decision to deny CCS's charter proposal. In reviewing a local school board's decision to deny a charter proposal, the State Board must determine, in part, whether the proposal was in compliance with the Charter Schools Law, including the requirements listed in section 27A—7. The parties do not dispute that CCS's proposal met 14 of the 15 statutory requirements of that section. The remaining requirement provides that a proposal must present "[e]vidence that the terms of the charter as proposed are economically sound for both the charter school and the school district." 105 ILCS 5/27A—7(a)(9) (West 2002). Before we can decide whether the State Board's decision that CCS's proposal did not satisfy this requirement was clearly erroneous, we must first decide what it means. On this question, our standard of review is *de novo*.

The fundamental rule of statutory interpretation is to ascertain and effectuate the legislature's intent. See *Hamilton v. Industrial Comm'n*, 203 Ill. 2d 250, 255 (2003); *Kraft, Inc. v. Edgar*, 138 Ill. 2d 178, 189 (1990). The plain language of a statute remains the best indication of this intent. See *People v. Alexander*, 204 Ill. 2d 472, 485 (2003), citing *Opyt's Amoco, Inc. v. Village of South Holland*, 149 Ill. 2d 265, 277 (1992). Where the language of a statute is clear, we may not read into it exceptions that the legislature did not express, and we will give it effect as written. See *Metzger v. DaRosa*, 209 Ill. 2d 30, 35 (2004); *Petersen v. Wallach*, 198 Ill. 2d 439, 446 (2002). We also will give undefined statutory terms

their ordinary meanings. *Texaco-Cities Service Pipeline Co. v. McGaw*, 182 Ill. 2d 262, 270 (1998); *Advincula v. United Blood Services*, 176 Ill. 2d 1, 17 (1996).

The parties all agree that the plain language of the Charter Schools Law is unambiguous, but they offer different readings of section 27A—7(a)(9). CCS contends that the State Board misconstrued section 27A—7(a)(9) in relying solely upon a school district's financial condition to deny a charter school proposal. CCS asserts that the State Board's interpretation improperly reduces the statutory inquiry into the single question of whether the district can afford the charter. According to CCS, section 27A—7(a)(9) clearly addresses the economics of the terms of the charter, not the economics of the district independent from the terms of the charter. That is, the statute focuses on the quality of the bargain posed by the charter: "Section 27A—7(a)(9) is simply a way to make sure that the charter proposal's terms do not seek more funding than what the district should be paying for the educational services provided." It anticipates, and imposes discipline on, the negotiations over funding between the parties. Indeed, the Charter Schools Law provides that any agreement over funding "shall be neither a financial incentive nor a financial disincentive to the establishment of a charter school." 105 ILCS 5/27A—11(b) (West 2002). CCS claims that this means that an agreement, which may depend on the district's financial condition, should have no bearing on the success of a charter school proposal.

In fact, CCS argues, considering the district's finances conflicts with the statute. CCS notes that many school districts face deficits unrelated to charter schools, but the legislature made no reference to such deficits in the statute. The funding of a charter school does not increase the cost of education, though it does shift or reallocate resources from the school district to the charter school

and consequently decreases revenues for the district. *Amicus* describes this adverse financial impact on the district as a "desirable corollary" to the Charter Schools Law, that is "both inevitable and legally irrelevant." It is inevitable because the purpose of the statute is to create choices for students, and thus competition for funding between public schools and charter schools. Because money follows students, schools have a financial stimulus to improve their performances. It is irrelevant because the list of charter school proposal requirements do not include "lack of adverse financial impact." To allow a local school board to deny a charter proposal because it may have an adverse financial impact on the district's budget would defeat the purpose of the statute, which is to create choice and thus competition.

The State Board and the local board respond that CCS misreads the plain language of section 27A—7(a)(9). Relying upon dictionary definitions, the State Board and the local board contend that the economic soundness requirement means that the terms of the charter school proposal must be financially stable and secure for both the charter school and the school district. Thus, the district's financial condition is a relevant consideration because there is no way to make this determination without looking at the impact of the proposal on the district's bottom line. According to the State Board and the local board, CCS's interpretation would write the words "both" and "school district" out of the statute. The local board acknowledges that section 27A—7(a)(9) touches upon financial discipline, but points to its decision to reject a proposal that would have either added more debt to an already-crushing budget deficit or necessitated cuts to existing programs as an example of such discipline.

The local board also notes that the Charter Schools Law is replete with provisions showing the legislature

was concerned about funding and its impact on district finances. The State Board states that when the legislature provided "the charter school and the local school board shall agree on funding and any services to be provided by the school district to the charter school" (105 ILCS 5/27A—11(b) (West 2002)), it intimated that the impact of a charter school proposal upon the district's finances is a legitimate concern. When the legislature provided that such agreements should not be an incentive or a disincentive to establishing a charter school (see 105 ILCS 5/27A—11(b) (West 2002)), it did not mean that the financial condition of the district is irrelevant. Instead, it is the prohibition against using funding as either an incentive or a disincentive which is irrelevant if the charter school proposal, on which the parties have yet to agree, is not economically sound. That is, the local board argues, this prohibition did not nullify the requirement of section 27A—7(a)(9).

The board asserts that CCS's reference to negotiation is ironic because it flatly refused to budge from its demand for 100% per capita funding. Further, the board asserts that the Charter Schools Law does not provide for rubber-stamp approval of any proposal. Both the State Board and the local board dispute CCS's reallocation argument. If simple reallocation were the mechanism for funding charter schools, then the legislature would not have provided transition impact aid, and it would not have provided that per capita funding should fall in a range between 75% and 125%.

Section 27A—7(a)(9) requires that the proposal must include "[e]vidence that the terms of the charter as proposed are economically sound for both the charter and the school district" (105 ILCS 5/27A—7(a)(9) (West 2002)), not evidence regarding the economic soundness of the district. CCS is therefore correct, in part: this requirement is addressed to the specific terms of the

proposal under consideration. A key term in any charter school proposal is the funding that the school expects to receive from the school district. This funding springs from an agreement between the party proposing the charter school and the local school board regarding per capita student tuition and other ancillary services. See 105 ILCS 5/27A—11(b) (West 2002). The per capita student tuition depends upon the average daily attendance at the school: the higher the attendance, the higher the tuition. Ancillary services include food and maintenance services, as well as curriculum services (see 105 ILCS 5/27A—11(b) (West 2002)), which presumably include special education.

"Soundness" means "financial security" or "solvency." Webster's Third New International Dictionary 2177 (1986). Plainly, when the legislature said economic soundness, it did not mean economic soundness in a vacuum. In drafting section 27A—7(a)(9), the legislature understood the funding specifics of a charter school proposal could affect the financial condition of both the charter school and the district. As the appellate court aptly noted, evidence that the charter school proposal is "economically sound" for the charter school and the school district "must realistically require consideration of the school district's finances." 351 Ill. App. 3d at 1117. Thus, the terms of the proposed charter—including attendance percentage and per capita funding percentage, as well as payment for special education and other ancillary services—must leave both the charter school and the school district financially secure and solvent.

We now turn to the merits of the State Board's decision to uphold the local board's decision to deny CCS's proposal. CCS in its reply brief states that it does not dispute "the main underlying facts such as (a) the financial condition of the Rockford School District, or (b) the calculation of the funding gap (the so-called 'deficit')

between the charter school revenues to be generated from the State and other independent sources and the total costs of running the charter school." Consequently, judicial review of this decision presents a mixed question of law and fact (see *Board of Education of Community Consolidated School District No. 59 v. Illinois State Board of Education*, 317 Ill. App. 3d 790, 796 (2000)), and we must determine whether the State Board's decision not to reverse the local board's decision to deny CCS's proposal was clearly erroneous.[1] Specifically, we must determine whether the State Board's decision that the proposal was not in compliance with the Charter Schools Law and was not in the best interests of Rockford school district students was clearly erroneous. We note that we review the decision of the State Board, not that of its appeal panel. See *Starkey v. Civil Service Comm'n*, 97 Ill. 2d 91, 100-01 (1983); *Wilson v. Department of Professional Regulation*, 317 Ill. App. 3d 57, 64-65 (2000). It is the State Board's decision which receives significant deference.

The State Board stated that it accepted evidence that the district was in "grave financial condition." An independent audit stated that the district's financial condition raised a "substantial doubt" about its ability to continue as an "ongoing concern." The State Board also stated that it rejected as "inconclusive and inad-

---

[1] The State Board notes that section 27A—9(e) of the Charter Schools Law states that even if the State Board finds a proposal is in compliance with the statute and in the best interests of the district's students, it "may" exercise its discretion and reverse the local board's decision to deny the proposal. Our standard of review—whether on a mixed question of law and fact or on a question involving the agency's discretion—asks whether the agency committed clear error. See *City of East St. Louis v. East St. Louis Financial Advisory Authority*, 188 Ill. 2d 474, 487 (1999), quoting *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 506 (1988).

equate" evidence that the proposal was economically sound for the school and the district. Specifically, the State Board found the "varying figures" regarding the school's impact on the district created "considerable confusion" over the proposal. Based on this uncertainty, the State Board stated that the proposal was not in the best interests of the district's students.

Citing *Balmoral Racing Club, Inc. v. Illinois Racing Board*, 151 Ill. 2d 367 (1992), CCS argues that the State Board improperly elevated one statutory factor, the economic soundness requirement of section 27A—7(a)(9), over the other statutory factors. The State Board responds that a proposal must meet all the requirements of the statute. We agree with the State Board. The State Board considered all of the requirements and found the proposal deficient in one respect: economic soundness. The State Board gave no more weight to "economic soundness" than to any other statutory factor. It simply concluded that, based on the facts presented by the parties, CCS failed to establish that the proposal was economically sound for the district because the district was in financial difficulty. We cannot say that the State Board's decision was clearly erroneous. On the record before us, we do not have a " 'definite and firm conviction' " that a mistake has been committed. *AFM Messenger*, 198 Ill. 2d at 395, quoting *United States Gypsum Co.*, 333 U.S. at 395, 92 L. Ed. at 766, 68 S. Ct. at 542.

CCS refused to accept the 75% per capita funding rate suggested by the board's charter school advisory committee. Though CCS floated various funding rates, it never departed from its request for 100% funding. CCS also toyed with attendance percentages. A July 19, 2001, document attached to CCS's appeal to the State Board showed the charter school would break even after five years at 87% per capita funding and 100% attendance. Another July 19, 2001, document showed that the charter

school would enjoy a \$338,643 surplus after five years at 75% per capita funding and 100% attendance. An August 2, 2001, document showed the charter school would suffer a \$30,717 deficit after five years at 75% per capita funding at 85% attendance.

At 100% per capita funding and 90% attendance, the school district would encounter a five-year deficit of at least \$1.03 million; the appeal panel calculated a five-year deficit of \$2.5 million. This deficit included stipends at least two-thirds as large as the per capita tuition for charter school students, many of whom would be dropouts from the district. In order to pay for the charter school, the district would have to borrow money or cut programs. If it borrowed money, the district would add to its \$32.65 million deficit. An independent audit stated that the district's deficit already threatened its future; clearly, adding more debt to that deficit would exacerbate the problem. If the district cut programs to pay for the charter school, its other students would suffer. The local board's list of contingent budget cuts included closing schools, shortening days at other schools, and eliminating staff, programs, and funding for books and computers. The local board reported that these cuts will adversely affect the education of all students, particularly those at academic watch list schools.

Certainly, as CCS contends, "The goals of the Charter School Law cannot be achieved without decreasing the funding for the district's existing schools" through purported reallocation. But funding a charter school can be fairly characterized as reallocation only if the proposal is 100% per capita for students already attending schools within the district and if the funding does not include any ancillary services. Neither situation is present here: the proposed charter school would serve dropouts, and the local board would pay for special education services. Further, reallocation should not imperil the entire school

district. CCS correctly concedes that the Charter Schools Law does not require a local school board to approve any proposal, regardless of whether it is economically unsound for the district. The statute was not intended to drive fiscally challenged districts out of business.

"Economic soundness" in section 27A—7(a)(9) is not a bright-line standard, but rather a continuum. The terms of some charter school proposals will be more economically sound for a school district than other proposals, depending upon their effects on the district's bottom line. We do not hold that any school district experiencing a budget deficit may deny a charter school proposal with impunity. We simply hold that, under the facts presented here, the State Board's decision that CCS's proposal was not in compliance with the Charter Schools Law or in the best interests of the district's students was not clearly erroneous.

CONCLUSION

For the reasons that we have stated, we affirm the judgment of the appellate court.

*Affirmed.*