# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**Esquivel v. Retirement Board of the Policemen's Annuity and Benefit Fund**, 2011 IL App (1st) 111010

---

| | |
|---|---|
| Appellate Court Caption | FRANK J. ESQUIVEL, Plaintiff-Appellee, v. THE RETIREMENT BOARD OF THE POLICEMEN'S ANNUITY AND BENEFIT FUND OF THE CITY OF CHICAGO, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-11-1010 |
| Filed | December 9, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The retirement board of the policemen's annuity and benefit fund's denial of plaintiff's application for pension service credits for his work as a civilian employee of the Chicago police department prior to becoming an officer was reversed on the ground that the decision was clearly erroneous where the evidence was sufficient to satisfy the plain and ordinary meaning of "investigative work" under the requirements of section 5-214(c) of the Illinois Pension Code, especially the evidence that plaintiff, as an Spanish-language interpreter, helped conduct official inquiries by assisting in the questioning of victims and arrestees, his translation work helped officers set up sting operations, and plaintiff was "clearly one whom this pension statute was intended to benefit." |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CH-23318; the Hon. Stuart Palmer, Judge, presiding. |
| Judgment | Affirmed and remanded. |

Counsel on        David R. Kugler, of Chicago, for appellant.
Appeal

                  Thomas P. Needham, of Chicago, for appellee.


Panel             JUSTICE McBRIDE delivered the judgment of the court, with opinion.
                  Presiding Justice Epstein and Justice Howse concurred in the judgment
                  and opinion.

**OPINION**


¶ 1        Defendant, the Retirement Board of the Policemen's Annuity and Benefit Fund of the
City of Chicago (the Board), appeals from the circuit court's order reversing the Board's
denial of plaintiff Frank J. Esquivel's application for pension service credits for his work as
a civilian employee for the Chicago police department. On appeal, the Board argues its
decision finding that Esquivel's position as a civilian senior public safety aide/bilingual did
not qualify for credit as prior other service pursuant to section 5-214(c) of the Illinois
Pension Code (40 ILCS 5/5-214(c) (West 2008)) was correct and the trial court erred in
reversing the Board's decision.

¶ 2        On February 6, 2009, Esquivel filed a letter with the Board seeking pension credit for
prior service with the Chicago police department under section 5-214(c) of the Illinois
Pension Code (40 ILCS 5/5-214(c) (West 2008)). Section 5-214(c) allows members of the
Policemen's Annuity and Benefit Fund to receive credit for prior service "while performing
investigative work for the department as a civilian employee of the department." 40 ILCS
5/5-214(c) (West 2008). Esquivel stated in his letter that he began his employment with the
Chicago police department as a civilian employee on January 2, 1974 and he continued his
civilian employment until February 1989 when he entered the Chicago Police Academy. In
this letter, he was assigned initially to desk duties in the 5th Police District and his
responsibilities included distribution of police radios, maintenance of attendance and
assignment sheets and an aide to citizens requesting police assistance. Esquivel was later
assigned the position of "timekeeper," and he maintained the daily time and transfer records
of all sworn and civilian personnel in the district, including furlough schedules, leaves of
absence and medical absences. Esquivel was also assigned to the senior services sections of
the 5th and 4th Police Districts and he assisted a senior officer in the senior citizen's bracelet
program.

¶ 3        In a March 2009 letter, Esquivel clarified that he sought credit for his years of service as
a civilian employee from February 1980 to February 1989. He attached his employee work
history from the City of Chicago department of human resources records management which
indicated his title as senior public safety aide/bilingual. Esquivel also included a copies of
the job description from November 1987 and October 1991. The November 1987 job

description stated the "characteristics of the class" as "Under general supervision, organizes and supervises community functions; and performs related duties as required." Examples of the duties included, but were not limited to, "assists in the recruitment and training of volunteers for various department programs; schedules volunteer training and community meetings; [and] identifies community crime problems and recommends crime prevention programs." The duties also included "prepares and types a variety of reports regarding telephone inquiries and meetings attended; maintains a detailed filing system; answers telephone inquiries and prepares appropriate correspondence; [and] makes work decisions regarding methods of handling routine situations." The October 1991 job description listed similar duties.

¶ 4    The Board conducted a hearing on Esquivel's application over two days, August 27, 2009, and March 25, 2010. Esquivel testified in support of his application and presented two additional police officers as witnesses in support. He also submitted letters from police officers familiar with his civilian employment.

¶ 5    Esquivel testified at the August hearing date. He stated that the qualifications were "to speak in front of groups for safety purposes." He noted that his title of senior public safety aide/bilingual was because he was used as an interpreter. Esquivel testified that he went to the police academy for a 10- or 12-week training course. He said he wore a green uniform with a patch that stated "senior public safety," but he was not allowed to carry a weapon. At the time he was hired in 1974, there were very few Hispanic officers.

¶ 6    While Esquivel worked in the 5th District, he worked at the desk and was in charge of the radios and distribution of shotguns. He stated that he would assist with station inquiries and he would be called to interpret for Spanish-speaking individuals. Esquivel testified that he interpreted for police officers after an initial arrest. Esquivel assisted in giving *Miranda* rights, questioning, informing the individual of the bond, and letting the individual know the court date. Esquivel also stated that he was subpoenaed to testify in court multiple times involving testimony about the giving of *Miranda* rights.

¶ 7    Esquivel testified that while working in the senior services section, he would help an officer in contacting victims of "con games" or "purse snatchings." He would try to get a description of the individuals and any other information for senior officers to investigate. He stated that the information he provided helped the officers to set up "stings" at currency exchanges, but Esquivel did not go with them during the investigations. In one instance, Esquivel also translated a couple of letters written in Spanish that indicated several drug houses by names, addresses and descriptions of individuals. Following the translations, the police obtained a search warrant.

¶ 8    Captain Michael Magliano testified in support of Esquivel's application at the August hearing. Captain Magliano stated that he had known Esquivel since he came to the police department in April 1977. Captain Magliano said that there was a Hispanic community within the 5th District, but the officers could not understand victims or arrestees because the district had very few Spanish-speaking officers. For that reason, the officer used Esquivel "all of the time for interpretations as far as anybody that was victimized." He also used Esquivel "many times for helping [him] advise offenders of their *Miranda* warnings, talking with the

victim, pulling out of the victim what happened to them so we could write our paper up." After the offender was advised of his rights, he would have Esquivel ask "some questions for us." Captain Magliano stated that Esquivel was "an asset to us all the time." Captain Magliano testified that if Esquivel was not available to assist in translations, it delayed an investigation "considerably."

¶ 9 At the March hearing date, Officer John Palmer testified in support of Esquivel's application. Officer Palmer stated that he was retired police officer and he worked with Esquivel when Officer Palmer was a speaker for the senior citizens unit for community services. They conducted crime prevention programs for the elderly. He worked city-wide, but mostly worked with Esquivel in Area 2, which included the 5th District. When Officer Palmer conducted programs in that area, half the people did not understand what he was saying. He would request Esquivel to assist him as an interpreter. The community meetings were to explain the "con games" happening to the elderly and how to prevent the crimes. Officer Palmer testified that if one of the Hispanic people had a problem or needed additional information, he or she would communicate to Esquivel what the problem was and he would bring the problem to Officer Palmer to report to his superiors. This helped to build a good relationship in the community because the people did not want to speak directly with the police officers, but when the people felt they were there to help, they would give information to Officer Palmer and Esquivel.

¶ 10 When asked by a Board member if Esquivel did "any safety or investigative work at the time when he was a civilian," Officer Palmer responded, "Did he conduct any safety? No, sir. I conducted it, but he backed it up by saying it in Spanish to the people."

¶ 11 No witnesses testified in opposition to Esquivel's application. The record before the Board included several documents: Esquivel's City of Chicago work history, the 1987 and 1991 job descriptions, and letters in support from Captain Magliano, Officer Palmer and Officer Daniel Gainer. In his letter, Captain Magliano described Esquivel's work.

"Officer Esquivel assisted me in several of my police investigations that required his expertise as a bi-lingual interpreter. Officer Esquivel would translate the *Miranda* Rights into Spanish and also translated any questions I had the responses into English. Officer Esquivel also initiated his own questioning that proved vital of the case. Without his assistance, my investigations would have been drastically delayed and could not have proceeded without translation and interpretation by Officer Esquivel. Criminal charges resulted in several of these investigations in which Officer Esquivel assisted. It is my understanding that Officer Esquivel was subpoenaed to appear in court as a result of his role in these investigations. In addition, while performing these additional duties he was working out of his title and pay grade."

¶ 12 Officer Palmer stated in his letter that Esquivel accompanied him to several community safety workshops as his bilingual interpreter. Their "goal was to address the senior citizenry in the area on the dangers of con games and other crimes against the elderly taking place in their respective communities. Several of the safety workshops were held in the predominantly Hispanic community, thus necessitating Officer Esquivel's services." Officer Palmer further wrote that Esquivel was "instrumental" in relaying police concerns to the

Hispanic community and that Esquivel "listened to the citizen concerns, relayed those concerns to me, and assisted in the investigations that ensued."

¶ 13    Officer Daniel Gainer also wrote a letter in support of Esquivel's application and noted that he would be unavailable to attend Esquivel's hearing, but "would be happy to discuss his request further." Officer Gainer stated that Esquivel "was instrumental in assisting members of the Hispanic community requesting police assistance." Officer Gainer also worked with Esquivel in the district lockup. "There, Officer Esquivel assisted in the processing of arrestees of all nationalities. Being a civilian employee somehow allowed him to gain a detainee's confidence to the point of their relaying additional information as to their plight. Officer Esquivel would pass this information on to me and I in turn would contact the arresting officer." Officer Gainer wrote that Esquivel's bilingual translation skills were "impeccable" and that Esquivel "became incredibly knowledgeable in his investigative skills and the district officers considered him their peer."

¶ 14    Following the second hearing date in March 2010, the Board voted to deny Esquivel's pension request. The Board issued its written decision in April 2010. The Board found that Esquivel "did not conduct any investigations. His main function was to act as an interpreter for Spanish speaking individuals." The Board concluded that Esquivel's "testimony and the testimony of others[ ] clearly demonstrate[d] that his function at the [Chicago police department] was to assist officers, when needed, as an interpreter. Esquivel did not perform any investigative work." The Board acknowledged the decision in *Diedrich v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 381 Ill. App. 3d 305 (2008), but found the decision to be "informative but not controlling" because the testimony from the hearings "clearly reflect[ed] that Esquivel did not perform any investigative work. His job assignment was to act an intepreter and to hand out when needed, radios and shotguns to officers assigned to various tasks."

¶ 15    In June 2010, Esquivel filed a petition for administrative review of the Board's decision in the circuit court. Following a hearing in March 2011, the circuit court found the Board's decision to be "manifestly erroneous" and reversed the Board's decision to deny Esquivel's application of pension credits for extra service.

¶ 16    This appeal followed.

¶ 17    On appeal, the Board argues that Esquivel did not perform "investigative work" as required by section 5-214(c) in his duties as a civilian senior public safety aide/bilingual for the Chicago police department.

¶ 18    When a party appeals the circuit court's decision on a complaint for administrative review, the appellate court's role is to review the administrative decision rather than the circuit court's decision. *Siwek v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 324 Ill. App. 3d 820, 824 (2001). The Administrative Review Law provides that judicial review of an administrative agency decision shall extend to all questions of law and fact presented by the entire record before the court. 735 ILCS 5/3-110 (West 2008). Further, "[t]he findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." 735 ILCS 5/3-110 (West 2008). "The standard of review, 'which determines the degree of deference given to the agency's decision,' turns on

whether the issue presented is a question of fact, a question of law, or a mixed question of law and fact." *Comprehensive Community Solutions, Inc. v. Rockford School District No. 205*, 216 Ill. 2d 455, 471 (2005) (quoting *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 390 (2001)).

¶ 19 "A mixed question of law and fact asks the legal effect of a given set of facts." *Comprehensive Community*, 216 Ill. 2d at 472. Stated another way, a mixed question is one in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or whether the rule of law as applied to the established facts is or is not violated. *AFM Messenger*, 198 Ill. 2d at 391. Here, the question of whether Esquivel's duties as a senior public safety aide/bilingual constituted "investigative work" under section 5-214(c) to receive pension credit presents a mixed question of law and fact. A mixed question of law and fact is reviewed under the clearly erroneous standard. *Comprehensive Community*, 216 Ill. 2d at 472.

¶ 20 The clearly erroneous standard of review lies between the manifest weight of the evidence standard and the *de novo* standard, and as such, it grants some deference to the agency's decision. *AFM Messenger*, 198 Ill. 2d at 392. "[W]hen the decision of an administrative agency presents a mixed question of law and fact, the agency decision will be deemed 'clearly erroneous' only where the reviewing court, on the entire record, is 'left with the definite and firm conviction that a mistake has been committed.' " *AFM Messenger*, 198 Ill. 2d at 395 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). Nonetheless, that the clearly erroneous standard is largely deferential does not mean, however, that a reviewing court must blindly defer to the agency's decision. *AFM Messenger*, 198 Ill. 2d at 395.

¶ 21 Section 5-214(c) provides, in relevant part:

"Any participant in this fund (other than a member of the fire department of the city) who has rendered service as a member of the police department of the city for a period of 3 years or more is entitled to credit for the various purposes of this Article for service rendered prior to becoming a member or subsequent thereto for the following periods:

* * *

(c) While performing safety or investigative work for the county in which such city is principally located or for the State of Illinois or for the federal government, on leave of absence from the department of police, or while performing investigative work for the department as a civilian employee of the department." 40 ILCS 5/5-214(c) (West 2008).

¶ 22 The cardinal rule in construing a statute, to which all others are subordinate, is to ascertain and give effect to the intent of the legislature. *Alvarez v. Pappas*, 229 Ill. 2d 217, 228 (2008). To determine legislative intent, we turn to the language of the statute, which is the best indicator of its intent. *Alvarez*, 229 Ill. 2d at 228. We must give the statutory language its "plain, ordinary, and popularly understood meaning," and "[w]here the language is clear and unambiguous, the statute must be given effect as written without resort to further aids of statutory construction." *Alvarez*, 229 Ill. 2d at 228. "[A]ll words and phrases must be interpreted in light of other relevant provisions of the statute and must not be construed in

isolation." *Brucker v. Mercola*, 227 Ill. 2d 502, 514 (2007). "Each word, clause and sentence of the statute, if possible, must be given reasonable meaning and not rendered superfluous." *Brucker*, 227 Ill. 2d at 514.

¶ 23 There are two cases relied on by the parties involving the interpretation of section 5-214(c): *Collins v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 407 Ill. App. 3d 979 (2011), and *Diedrich v. Retirement Board of the Policemen's Annuity & Benefit Fund*, 381 Ill. App. 3d 305 (2008). The Board asserts that the instant case is more similar to *Collins*, where this court found that the officer did not perform investigative work to qualify for pension service credits under section 5-214(c). *Collins*, 407 Ill. App. 3d at 986. However, Esquivel contends that the facts of this case are "factually identical" to those present in *Diedrich*, where the reviewing court reversed the Board and held that the officer's activities satisfied the plain and ordinary meaning of investigative work. *Diedrich*, 381 Ill. App. 3d at 312.

¶ 24 In *Collins*, we pointed out that the legislature has not defined the term "investigative work" and considered dictionary definitions.

" 'Investigate' is defined as 'to observe or study by close examination and systematic inquiry,' 'to make a systematic examination,' and 'to conduct an official inquiry.' Webster's Ninth New Collegiate Dictionary 636 (1985). Additionally, Black's Law Dictionary defines 'investigate' as 'to inquire into (a matter) systematically; to make (a suspect) the subject of a criminal inquiry' and '[t]o make an official inquiry.' Black's Law Dictionary 830 (7th ed. 1999)." *Collins*, 407 Ill. App. 3d at 985.

¶ 25 In *Diedrich*, Dolores Diedrich sought pension credit under section 5-214(c) for the years she worked as a civilian Spanish translator for the Chicago police department. At the hearing before the Board, Diedrich testified that her main duty was to interpret at the police station both in person and on the telephone. While translating, Diedrich was required to initiate particular lines of questioning on occasion when the police officer seeking the translation did not ask questions germane to the situation, to initiate follow-up questions when they seemed to be required, and to assess the credibility of the civilians for whom she translated and relay her impressions to the police officers involved. *Diedrich*, 381 Ill. App. 3d at 306-07. Diedrich also would substitute for police officers on vacation in the review office and would then "examine confidential case reports to determine whether there were patterns indicating that one offender might be involved in more than one crime" and submit her findings to the department. She estimated that she spent two months of the year on this task. *Diedrich*, 381 Ill. App. 3d at 307.

¶ 26 Diedrich also presented the testimony of four police officers. Each of the officers testified that Diedrich's duties were investigative in nature because the investigations needed the plaintiff's accurate translations, her ability to initiate questions and her opinion about a person's credibility. *Diedrich*, 381 Ill. App. 3d at 307-08. The Board denied Diedrich's request for pension credit, concluding that her work did not constitute investigative work. The circuit court affirmed the Board's ruling. *Diedrich*, 381 Ill. App. 3d at 309.

¶ 27 On appeal, the reviewing court found that Diedrich did "work much more elaborate than mere translation. She participated in legal inquiries and the taking of evidence." *Diedrich*,

-7-

381 Ill. App. 3d at 310. The *Diedrich* court reversed the Board's denial, finding that Diedrich was "clearly one whom this pension statute was intended to benefit" and that "the plain and ordinary meaning of 'investigative work' includes the activities described by [Diedrich] and four police officers in unrebutted testimony." *Diedrich*, 381 Ill. App. 3d at 311-12.

¶ 28 In contrast to the work performed in *Diedrich*, Esther Collins sought pension service credits under section 5-214(c) for her work as a police dispatcher aide. For this civilian position, Collins "wrote down information from a 911 call and passed that information on to the dispatcher" and while she did ask the callers preliminary questions, "[o]nce Collins prepared her card and passed it to the dispatcher, her role was complete." *Collins*, 407 Ill. App. 3d at 986.

¶ 29 In *Collins*, we distinguished the duties performed by Collins with those performed by Diedrich. "Unlike the plaintiff in *Diedrich*, Collins here was not asked to translate police questions, to initiate lines of questioning, or to assess credibility." *Collins*, 407 Ill. App. 3d at 986. We further noted that "Collins' role as a police dispatcher aide was not to make a systematic inquiry or examination to gather evidence of a crime; rather, she prepared an initial response card for police and on occasion fulfilled requests for name and license plate information or prepared requests for evidence technicians or police crime laboratory units to be sent to the scene of an emergency" whereas Diedrich "participated in legal inquiries and helped to gather evidence." *Collins*, 407 Ill. App. 3d at 986.

¶ 30 We find the instant case to be closer to *Diedrich* than *Collins*. Here, the record shows that Esquivel presented his own testimony to the Board as well as testimony from Captain Magliano and Officer Palmer. In addition, Esquivel included letters in support of his application from Captain Magliano, Officer Palmer and Officer Gainer. We note that the Board's decision does not mention the letters submitted in support of Esquivel's application. The Board's decision minimized the unrebutted evidence presented regarding Esquivel's work as a civilian employee.

¶ 31 Esquivel testified that he interpreted for police officers after an initial arrest, assisted in giving *Miranda* rights, questioning, informing the individual of the bond, and let the individual know the court date. He also stated that information he received from safety workshops helped officers to set up "stings" at currency exchanges and that his translation of a couple letters resulted in warrants for drug houses.

¶ 32 According to the Board, Captain Magliano testified that "he was aware from time to time police officers used Esquivel when needed, to assist by interpreting from Spanish to English information given by Hispanic citizens." However, Captain Magliano's testimony was much more descriptive of Esquivel's work. He testified that he used Esquivel "many times for helping [him] advise offenders of their *Miranda* warnings, talking with the victim, pulling out of the victim what happened to them so we could write our paper up" and the officers would have Esquivel ask "some questions for us." Further, in his letter, Captain Magliano wrote that "Officer Esquivel also initiated his own questioning that proved vital of the case. Without his assistance, my investigations would have been drastically delayed and could not have proceeded without translation and interpretation by Officer Esquivel." These details from Captain Magliano present a different view of Esquivel's work than the Board's

summary.

¶ 33    The Board also emphasizes a response from Officer Palmer that Esquivel did not engage in investigative work. However, the transcript of Office Palmer's testimony shows that the response was not as significant as the Board suggests. A Board member asked if Esquivel did "any safety or investigative work at the time when he was a civilian," Officer Palmer responded, "Did he conduct any safety? No, sir. I conducted it, but he backed it up by saying it in Spanish to the people." Officer Palmer's response did not state that Esquivel did not perform any investigative work. Moreover, Officer Palmer's letter to the Board stated that Esquivel "listened to the citizen concerns, relayed those concerns to me, and assisted in the investigations that ensued."

¶ 34    Additionally, the letter from Officer Gainer described Esquivel as "incredibly knowledgeable in his investigative skills." The officer also wrote, "Being a civilian employee somehow allowed [Esquivel] to gain a detainee's confidence to the point of their relaying additional information as to their plight. Officer Esquivel would pass this information on to me and I in turn would contact the arresting officer."

¶ 35    The evidence presented to the Board demonstrates that Esquivel did more than "act as an interpreter and to hand out when needed, radios and shotguns to officers assigned to various tasks." Like *Diedrich*, Esquivel helped to conduct official inquiries by assisting in the questioning of victims and arrestees. Captain Magliano wrote that Esquivel was able to initiate questions and his work went beyond his title and pay grade. Esquivel's translation work helped officers to set up sting operations and, on at least one occasion, to obtain a search warrant. As the court found in *Diedrich*, Esquivel "is clearly one whom this pension statute was intended to benefit" and his work satisfied the plain and ordinary meaning of investigative work. *Diedrich*, 381 Ill. App. 3d at 311-12. We find that the Board's decision was clearly erroneous and after viewing the entire record, we are left with the definite and firm conviction that a mistake has been committed. Esquivel presented sufficient evidence to satisfy the requirements of section 5-214(c) and should be awarded the applicable pension service credits.

¶ 36    Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County reversing the findings of the Board. We remand this matter to the Board for a determination of the pension credit to which Esquivel is entitled.

¶ 37    Affirmed and remanded.