2021 IL App (1st) 200801-U

FIFTH DIVISION
Order filed: May 14, 2021

No. 1-20-0801

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| JUDLAU CONTRACTING, INC., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CH 11042 |
| | ) | |
| | ) | |
| THE CITY OF CHICAGO, a Municipal Corporation | ) | |
| Organized under the laws of Illinois, THE CITY OF | ) | |
| CHICAGO DEPARTMENT OF AVIATION, JAMIE L. | ) | |
| RHEE, Commissioner of the City of Chicago Department | ) | |
| of Aviation, GINGER EVANS, Former Commissioner of | ) | |
| the City of Chicago Department of Aviation, THE CITY | ) | |
| OF CHICAGO DEPARTMENT OF PROCUREMENT | ) | |
| SERVICES, SHANNON E. ANDREWS, Chief | ) | |
| Procurement Officer of the City of Chicago Department of | ) | |
| Procurement Services, | ) | Honorable |
| | ) | David B. Atkins, |
| Defendants-Appellees. | ) | Judge, presiding. |

_____

JUSTICE HOFFMAN delivered the judgment of the court.
Justices Cunningham and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We affirm the circuit court's denial of the plaintiff's common law writ of *certiorari* on the grounds that the administrative agency's decision was not clearly erroneous.

¶ 2    The plaintiff, Judlau Contracting, Inc. (Judlau) appeals from an order of the circuit court of Cook County, denying its common law writ of *certiorari* and affirming the decision of the Chief Procurement Officer (CPO) of the City of Chicago Department of Procurement Services. On appeal, Judlau argues that the CPO's decision should be overturned on the grounds that it was clearly erroneous. For the reasons that follow, we affirm the circuit court's denial.

¶ 3    The following facts were adduced from the pleadings and the administrative record.

¶ 4    On April 14, 2017, the City of Chicago Department of Aviation (CDA) entered into a contract with Judlau to complete a construction project at O'Hare International Airport (the Contract). The followings provisions of the Contract are relevant to the disposition of this appeal. Article VIII, section G.1 of the Contract provided that the Commissioner of the CDA may suspend work under the Contract and specified when Judlau would be entitled to additional compensation as a result of the suspension:

"The Commissioner has authority to suspend Work wholly, or in part for such period of time as the Commissioner may deem necessary due to conditions unfavorable for the satisfactory prosecution of the Work, or to conditions which, in the Commissioner's opinion, warrant such actions or for such time as is necessary to carry out orders given; or to perform any or all provisions of the Contract. If the Commissioner suspends Work for more than seven Calendar Days, the Contractor will be entitled to compensation for the following costs of the suspension unless the suspension and/or costs were caused by any act or omission of the Contractor: demobilization and remobilization, field supervision (based upon accepted staffing plan), and idle equipment costs as provided in Article X."

¶ 5    In the event that work on the project was delayed, article VIII, section B.1 of the Contract provided the following:

> No Damages for Delay: If the Contractor is delayed in the commencement, prosecution or completion of the Work by any act of the City, including but not limited to a delay, change, addition, deletion or modification in the Work or any omission, neglect or default of the City, or by order of the Commissioner, or the Commissioner's designee, or by any cause beyond the Contractor's control, none of which are due to any fault, neglect, act or omission on Contractor's part, then the Contractor shall be entitled solely and exclusively to an extension of time only."

¶ 6    The procedure Judlau must follow to bring a claim or dispute under the Contract is outlined in article XVII, section A.2. Relevant here, Judlau must submit its claim to the Commissioner of the CDA for resolution, and if Judlau does not agree with the final decision, it must file a dispute with the CPO within 30 days. Article XVII, section B.5 of the Contract provides that, if Judlau does not agree with the final decision of the CPO, its "sole and exclusive remedy is judicial review by a common law writ of *certiorari*."

¶ 7    Article XIX, section LL of the Contract provided that Judlau must comply with the Project Labor Agreement (PLA) entered into between the City of Chicago and various labor unions:

> **"Project Labor Agreement:** Pursuant to an Ordinance passed by City Council, effective as of February 22, 2011, the City has entered into the Project Labor Agreement ("PLA"), which is hereby referenced and included in the Contract Documents, with various trades regarding projects as described in the PLA, together with a list of signatory unions.

Contractor acknowledges familiarity with the requirements of the PLA and its applicability to any Work under this Contract, and shall comply in all respects with the PLA."

¶ 8 The PLA, in turn, required Judlau and the CDA to ensure that only signatories and other qualifying persons, firms, or companies perform work on the project. Section 11 of the PLA outlined the mandatory procedures for resolving jurisdictional disputes between signatory labor unions:

"In the event of a jurisdictional dispute by and between any labor organizations signatory hereto, such labor organizations shall take all steps necessary to promptly resolve the dispute. In the event of a dispute relating to trade or work jurisdiction, all parties, including, the employers, contractors or subcontractors agree that a final and binding resolution of the dispute shall be resolved as follows:

a.) Representatives of the affected trades shall meet on the job site within forty-eight (48) hours after receiving notice in an effort to resolve the dispute ***.

b.) If no settlement is achieved subsequent to the preceding Paragraph, the matter shall be referred to the Chicago & Cook County Building & Construction Trades Council which shall meet with the affected trades within forty-eight (48) hours subsequent to receiving notice. An agreement reached at this Step shall be final and binding.

c.) If no settlement agreement is reached during the proceedings contemplated by Paragraph "a" or "b" above the matter shall be immediately referred to the Joint Conference Board established by the Standard Agreement between the Construction Employers' Association and the Chicago & Cook County Building & Construction Trades Council, which may be amended from time to time, for final and binding resolution of said dispute."

¶ 9    Section 12 of the PLA incorporated its terms into any collective bargaining agreement between signatory unions and a contractor or subcontractor and mandated that the PLA's terms supersede any inconsistent collective bargaining agreement provision.

¶ 10    Lastly, section 13 of the PLA provided the following:

"The parties agree that in the implementation and administration of this Agreement, it is vitally necessary to maintain effective and immediate communication so as to minimize the potential of labor relations disputes arising out of this Agreement. To that end, each party hereto agrees to designate, in writing, a representative to whom problems can be directed which may arise during the term of this Agreement. Within forty-eight (48) hours after notice of the existence of any problem, representatives of each party shall meet to discuss and, where possible, resolve such problems."

Section 13 goes on to name the designated representative for both the signatory unions and the City of Chicago.

¶ 11    Judlau began work under the Contract on May 22, 2017. Relevant here, Judlau hired Truck King to perform various scopes of work on the project, including off road articulated end dump trucking. Truck King utilized members of International Brotherhood of Teamsters Local 876 (Local 876) to perform the work. On May 26, 2017, Judlau received two letters from the International Union of Operating Engineers Local 150 (Local 150), claiming that Judlau was in violation of the Mid-American Regional Bargaining Association (MARBA) Illinois Heavy, Highway and Underground Agreement Districts 1-2-3 (the MARBA Agreement) with regard to the off-road hauling units. Specifically, Local 150 alleged that the O'Hare construction site was within their "jurisdictional territory" and that Judlau hired "a non-bargaining unit employee and

subcontracted work covered by the scope of work of the agreement to a non-signatory company pursuant to [the MARBA] Agreement." The letter indicated that Local 150's business representative brought this grievance to Judlau's attention at the job site to no avail and requested that Judlau attend a meeting on June 20, 2017, to address its grievance. In a second letter sent that same day, Local 150 also alleged that Judlau failed to employ a "Craft Foreman" in accordance with the MARBA Agreement.

¶ 12    On the evening of June 1, 2017, Thomas Lyon, the CDA's construction manager for the O'Hare project, sent the following email to Peter Console, an operations manager at Judlau, and Gil Crespos, Judlau's project manager:

> "I received notice tonight from the City that Teamsters Local 786 are being used on the [O'Hare] project. Local 786 is not signatory to the Project Labor Agreement at O'Hare. This is in violation of the Project Labor Agreement. I believe these Teamsters are driving the big off roads, but I'm not sure. Teamsters Local 731 and [] Local 150 are signatory to the PLA but the Teamsters Local 786 are not. It appears to be a jurisdiction issue but the issue is settled between the two signatory unions.
>
> We can't have a contractor violating the PLA. Are you guys aware of this issue? If this is the case you need to stop them from working and get this issue resolved, asap. Please look into this issue and let's meet tomorrow morning. I'm available at either 8am or 10am. This needs to get resolved asap."

¶ 13    The next morning, on June 2, 2017, Lyon sent a second email to Console and Crespos, reminding them of the PLA's mandatory procedures for resolving jurisdictional disputes between

labor unions. He concluded the email by stating: "Let me know the status of this issue. I await your plan to rectify this issue."

¶ 14    Approximately 30 minutes later, Crespos sent Lyon the following text message, apparently in response to Lyon's emails:

"Is there any formal notice you can send me (that the city received) that states exact specifics with regards to the dispute or background on the dispute?

The formal notification from the entity that is proclaiming there is a breach of the PLA would suffice.

Before we begin the process of getting a dispute look at [*sic*] and resolved, I would like to fully understand their concerns. Up to this point, nothing has been formalized with specifics."

Ten days later, on June 12, 2017, Crespos sent another text message to Lyon, asking: "[You] available?" Lyon does not appear to have responded to Crepos's text messages.

¶ 15    On June 19, 2017, the CDA sent Judlau a notice to suspend work, alleging that it was in violation of the PLA and the Contract. The notice explained that Judlau's subcontractor, Truck King, employed workers from Local 786, which is not one of the signatories to the PLA. The CDA directed Judlau to stop all work "involving personnel non-compliant with the PLA, including but not limited to the Teamster Local 786" until the matter was resolved in accordance with the PLA. The letter also stated that "any delays, and other effects of non-compliance with these, and other contract requirements must be corrected by the Contractor at no additional cost to the City." That same day, Judlau responded to the CDA by letter, asserting that it was in full compliance with the PLA. According to Judlau, Local 786 was an affiliate of Teamsters' Joint Council 25 and, under

section 1 of the PLA, any affiliate of Teamsters' Joint Council 25 can be hired to perform work for projects governed by the PLA. Judlau stated that, as a result, "any time and cost lost due to the stop work order *** will be the responsibility of the City of Chicago."

¶ 16    The following day, the CDA sent Judlau a reply, informing it that Local 786's compliance with the PLA was under review and that it should stop all work being done by Local 786 employees until the CDA reached a determination. The CDA also reiterated that Judlau was responsible for "[a]ny delays and other direct or indirect effects of this non-compliance." In a reply letter sent that same day, Judlau explained its view that the suspension was caused "by the City of Chicago for reasons not related to an act or omission of the Contractor per the terms of [the Contract]," and that it expected "to receive an extension of time and recovery of costs as described therein for the time during which the suspension of work persists." Judlau also complained that the CDA failed to respond to its earlier request for a meeting, apparently referring to Crespos's June 12, 2017 text message.

¶ 17    Judlau followed up with another letter on June 22, 2017, reiterating its position that: (1) it was in compliance with both the PLA and the Contract; (2) the CDA was responsible for damages related to the stop work order; and (3) it expected to receive a time extension and costs for the time its work was suspended. Also on June 22, 2017, Judlau sent the CDA a notice of delay pursuant to the Contract. The CDA rejected Judlau's notice of delay in a letter sent the following day, stating that the delay provision of the Contract did not apply in these circumstances because "[t]he cause of the delay is not considered to be beyond the reasonable control of the Contractor." The CDA went on to call the matter a "union issue" that Judlau was "required to rectify."

¶ 18    In a letter dated June 26, 2017, the CDA offered more detail regarding its claim that Judlau was in violation of both the PLA and the Contract:

"The issue at hand is a union disagreement with a sub-contractor hired by Judlau which is proven by the current legal case between Local 786 and Local 731 and the involvement of [Local] 150 in the issue, and all union issues with its own sub-contractor are the contractual responsibility of Judlau. In addition, Judlau failed to follow the jurisdictional dispute procedure laid out in the PLA which puts Judlau in violation. This issue under the PLA is the responsibility of the Contractor and the Contractor is required to fulfill its obligations under the Contract. The Contractor will be held responsible for all production losses and costs associated with the non-compliance of the PLA and will be required to meet the original Contract completion date with no added costs to the City of Chicago."

¶ 19    In a response issued on the same date, Judlau stated that it "unequivocally disagree[d]" with the factual allegations by the CDA and accused the CDA of changing its reasoning behind the suspension of work. Regarding the CDA's claim that there was a jurisdictional dispute between unions and Judlau failed to comply with the PLA's dispute procedures, Judlau asserted that it had "not yet received a formal complaint from Teamsters Local 731 or [] Local 150 as alleged by the City." Judlau also requested a meeting with the CDA, stating its belief that it was "the only way to resolve this issue." The next day, Judlau sent what it called "a notice of claim" to the CDA, reiterating that the CDA's suspension of work was not justified for the reasons outlined in its various letters. Judlau stated that once the suspension of work was lifted, it would "analyze the full

impact in terms of time and cost" and reserved the right "to submit a claim *** for the fully recovery of the damages suffered."

¶ 20    On June 28, 2017, the CDA acknowledged receipt of Judlau's "notice of claim" and stated that it "completely and categorically reject[ed] any and all delay claims put forth by Judlau." The letter also stated the following:

> "The issue at hand is a union disagreement involving a subcontractor hired by the Contractor which, according to the PLA, is the responsibility of [Judlau] to resolve. The grievances filed by Local 150 on May 26, 2017 and [Judlau]'s correspondence responding to the grievances proves that, aside from identifying this as a labor union issue, highlights that the Contractor was aware of the situation prior to the City's notification and chose not to take steps to get in compliance of the PLA.

The letter further explained that "it is clear from third party correspondence that the issue was well documented and presented to [Judlau] prior to any notification from the City," and that Judlau nevertheless "knowingly and willfully chose to proceed with a situation while being fully aware of it being contrary to contractual agreements."

¶ 21    On July 6, 2017, the CDA lifted the suspension of work, explaining that it had decided to do so after learning that a grievance hearing was scheduled for July 13, 2017. The CDA also stated that this action was contingent on Judlau attending the hearing and agreeing to abide by the outcome going forward. The grievance hearing went forward and, as a result, Judlau was ordered to pay $224,632.95 to the Local 150 Assistance Fund.

¶ 22    What followed were a series of letters from the CDA to Judlau informing Judlau that it was "critically behind schedule" by as much as 27 calendar days and directing Judlau to submit a

recovery schedule. On July 21, 2017, Judlau requested a 21-day extension of time to complete work, asserting that the delay was caused by "an act or omission by the City of Chicago" beyond its reasonable control. The CDA denied its request for an extension.

¶ 23    On August 7, 2017, Judlau submitted a notice of claim to the Commissioner of the CDA pursuant to Article XVII, section A.2(j) of the Contract, seeking a 21-day extension of time and "compensation for re-mobilization, field supervision, additional resources required, productivity loss, idle time and any subcontractor costs." Judlau argued that it was entitled to such relief because it was, at all times, in compliance with the Contract and the PLA and the delay was the result of the CDA's improper suspension of work order.

¶ 24    On September 1, 2017, the Commissioner denied Judlau's claim in a written decision. With regard to the substance of Judlau's claim, the Commissioner determined that Judlau violated the PLA in two respects: (1) it failed to follow the PLA's jurisdictional dispute procedures when Local 150 notified it of its grievance and (2) it failed to promptly inform the CDA of the grievance. The Commissioner concluded that Judlau's failure to comply with the PLA was a violation of the Contract, and as a result, held that the suspension of work order was appropriate and any delays resulting from its issuance were caused by Judlau's acts or omissions. Pursuant to Article XVII, section B.1 of the Contract, Judlau sought to have its claim reviewed by the CPO.

¶ 25    On July 31, 2018, the CPO issued a written decision. The CPO found that the suspension of work order for the period of June 19 to June 26, 2017, was not due to Judlau's acts or omissions and that Judlau was entitled to compensation for costs attributable to that period of time because the CDA did not clearly explain all of its reasons for suspending work in its June 19, 2017 letter. The CPO noted that the initial justification, that Judlau was employing a union that was not a

signatory to the PLA, was not accurate because the union in question was an affiliate of a signatory union and so their hiring complied with the PLA. The CPO went on to find, however, that by June 26, 2017, Judlau was aware that "the issue at hand was Judlau's failure to follow the jurisdictional dispute procedure set forth in the PLA" regarding Local 150's grievances. The CPO thus concluded that from June 26 to July 6, 2017, the continued suspension of work and all costs related to it were due to Judlau's acts and omissions because Judlau failed to provide the CDA with any information relating to Local 150's grievances or the steps it was taking to resolve them. In reaching this decision, the CPO rejected Judlau's argument that Local 150's grievances were not subject to the PLA, noting that the PLA supersedes any inconsistent provisions in other bargaining agreements and finding that, in any event, Judlau had a duty to communicate with the CDA regarding potential labor disputes. Regarding Judlau's request for a time extension, the CPO found that Judlau was not entitled to an extension because "the delay was not entirely due to the C[DA]'s actions, and the delay was not beyond the reasonable control of Judlau, as that term is defined in the Contract."

¶ 26    On August 30, 2018, Judlau filed a complaint in the circuit court of Cook County, in which it petitioned the court for a common law writ of *certiorari* and sought judicial review of the CPO's decision. The complaint named as defendants the City of Chicago, the CDA, the Commissioner of the CDA, the City of Chicago Department of Procurement Services, and the CPO. On June 12, 2020, the circuit court denied Judlau's petition and affirmed the CPO's decision. This appeal followed.

¶ 27    On appeal, Judlau raises two arguments. First, it contends that the CPO erred when she determined that it was only entitled to costs related to the suspension of work from June 19 to June

26, 2017. Judlau next argues that the CPO erred when she determined that it was not entitled to an extension of time. We address each argument in turn.

¶ 28    Pursuant to the Contract, the exclusive remedy for a party who disagrees with the CPO's decision is to file a common law writ of *certiorari* in the circuit court. "A common law writ of *certiorari* is a general method for obtaining circuit court review of administrative actions when the act conferring power on the agency does not expressly adopt the Administrative Review Law [(735 ILCS 5/3-101 to 3-113 (West 2018))] and provides for no other form of review." *Hanrahan v. Williams*, 174 Ill. 2d 268, 272 (1996); see also *Outcom, Inc. v. Illinois Department of Transportation*, 233 Ill. 2d 324, 333 (2009) (If the enabling statute does not adopt the Administrative Review Law, a common law writ of *certiorari* survives as an available method of review.). "The standards of review under a common law writ of *certiorari* are essentially the same as those under the Administrative Review Law." *Hanrahan*, 174 Ill. 2d at 272.

¶ 29    In reviewing a final decision under the Administrative Review Law, this court reviews the administrative agency's decision and not the circuit court's determination. *Bolger v. Department of Children and Family Services*, 399 Ill. App. 3d 437, 448 (2010). "The deference given to an agency's decision depends upon whether the question is one of fact, one of law, or a mixed question of fact and law." *American Federation of State, County & Municipal Employees (AFSCME), Council 31 v. Illinois Labor Relations Board, State Panel*, 2014 IL App (1st) 123426, ¶ 35.

¶ 30    "An administrative agency's findings and conclusions on questions of fact are deemed to be *prima facie* true and correct" and "a reviewing court is limited to ascertaining whether such findings of fact are against the manifest weight of the evidence." *City of Belvidere v. Illinois State*

*Labor Relations Board*, 181 Ill. 2d 191, 204 (1998). "An administrative agency's factual determinations are contrary to the manifest weight of the evidence where the opposite conclusion is clearly evident." *Id.* In contrast, an administrative agency's decision on a question of law is not binding on a reviewing court. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008). We review *de novo* an agency's decision on a question of law. *520 South Michigan Avenue Associates v. Department of Employment Security*, 404 Ill. App. 3d 304, 312 (2010).

¶ 31 A mixed question of law and fact concerns the legal effect of a given set of facts, which requires a reviewing court to determine whether the established facts satisfy applicable legal rules. *Comprehensive Community Solutions, Inc. v. Rockford School District No. 205*, 216 Ill. 2d 455, 472 (2005). An agency's conclusion on a mixed question of law and fact is reviewed for clear error. *Id.* "Thus, when the decision of an administrative agency presents a mixed question of law and fact, the agency decision will be deemed clearly erroneous only where the reviewing court, on the entire record, is left with the definite and firm conviction that a mistake has been committed." (Internal quotations omitted.) *Id.*

¶ 32 Judlau first challenges the CPO's finding that it was not entitled to compensation for the period after June 26, 2017, because the continued suspension of work was due to its own acts and omissions. Judlau raises three arguments as to why the CPO's decision on this issue was clear error: (1) the PLA does not impose a duty on Judlau to communicate to the CDA regarding potential labor disputes because the CDA and Judlau are on the same side of that bargain; (2) even if the PLA did impose such a duty, the record does not support a finding that it failed to

communicate with the CDA; and (3) the CPO conflated a grievance filed under the MARBA Agreement with a jurisdictional dispute brought pursuant to the PLA.

¶ 33   The CDA responds that the Contract included a provision that required Judlau to comply in all respects with the PLA, and therefore, Judlau had a duty to communicate with it regarding labor disputes. It also maintains that the CPO's factual determination that Judlau failed to communicate with it regarding Local 150's labor dispute is not against the manifest weight of the evidence. Lastly, it argues that, regardless of how Local 150 styled its claim, Judlau was obligated to follow the procedures of the PLA or offer the CDA an explanation as to why it believed the dispute should not be handled according to the PLA.

¶ 34   To resolve Judlau's first claim, we are called upon to determine whether, under the Contract, the CDA's decision to suspend work for longer than seven days was the result of an act or omission by Judlau. In other words, we must examine the "legal effect of a given set of facts." *Id.* Therefore, we are presented with a mixed question of fact and law and we review the CPO's decision for clear error.

¶ 35   After review, we conclude that the CPO's decision was not clearly erroneous. The Contract provided that the Commissioner may suspend work on the project "for such time as is necessary *** to perform any or all provisions of the Contract" and entitled Judlau to costs only if the suspension lasted longer than seven days and the suspension was not caused by Judlau's acts or omissions. The CPO concluded that, although the suspension lasted longer than seven days, Judlau's acts and omission were responsible for the continued suspension of work as of June 26, 2017, which is the date that the CDA informed Judlau that "the issue at hand was Judlau's failure to follow the jurisdictional dispute procedure set forth in the PLA" with regard to Local 150's

allegations. The CPO found that Judlau "failed to provide [the] CDA with any information relating to the grievance filed by Local 150 or the steps it was taking to resolve the grievance" even though it had a "duty to communicate with [the] CDA regarding potential labor disputes," which were acts and omissions that resulted in the continued suspension of work.

¶ 36    By the plain terms of the Contract, Judlau was obligated to comply with the PLA in all respects, which obviously included the jurisdictional dispute provisions. And the Contract granted the Commissioner of the CDA the authority to suspend work to ensure that the Contract's provisions were being complied with. By June 26, 2017, Judlau was aware that the CDA's continued suspension of work was premised on its belief that Judlua was in violation of the PLA due to "a union disagreement" that involved Local 150 and Judlau's failure "to follow the jurisdictional dispute procedure laid out in the PLA" with regard to that disagreement. But rather than acknowledge Local 150's grievance and explain its apparent belief that the grievance was not governed by the PLA, even though the PLA's terms are incorporated into any collective bargaining agreement and its terms supersede any inconsistent provisions, Judlau instead chose to claim it was in full compliance with the PLA and state that it had "not yet received a formal complaint from [Local 150] as alleged by the [CDA]." Even when the CDA sent a follow-up letter two days later in which it clearly indicated that the May 26, 2017 grievance filed by Local 150 was the motivation for suspending work, Judlau remained silent regarding the matter, and the work suspension continued for 8 more days. Ultimately, the CDA lifted the suspension of work when it learned, apparently from a third party, that a grievance hearing would be held on July 13, 2017, to resolve the matter. As mentioned, the CPO concluded that Judlau's failure to be forthright with the CDA regarding Local 150's grievance was an act or omission that resulted in the continued

suspension of work. Given this record, we cannot say that the CPO's decision leaves us with the definite and firm conviction that a mistake has been committed.

¶ 37    Judlau nevertheless argues that the CPO erred because the PLA does not impose on it any duty to communicate with the CDA regarding labor disputes. According to Judlau, the PLA is a bilateral agreement where the CDA and its contractors are on the same side of the bargain opposite the labor unions, and as such, it only had a duty to communicate with the labor unions regarding disputes, not the CDA. Judlau's argument is unavailing because Judlau and the CDA were on opposite sides of the Contract and had a duty to communicate with each other. See *Dawdy v. Sample*, 178 Ill. App. 3d 118, 125 (1989) (explaining that "every contract contains an implied promise of good faith and fair dealing between the parties to the contract" and that "[t]he duty to communicate is a part of the implied promise to act in good faith and to deal fairly with each other"). The Contract required Judlau to comply with the PLA in all respects, and to that end, when the CDA communicated its position that Judlau had violated the PLA by failing to follow the jurisdictional dispute provisions in response to Local 150's grievance, Judlau had a duty to be communicative and forthright about the grievance.

¶ 38    Judlau also argues that the CPO erred in partially denying its request for costs because the record does not support her determination that it was the party who failed to communicate. According to Judlau, the CDA's poor communication was the cause of the work suspension because its letters were unclear and it ignored Judlau's repeated entreaties for a meeting. Before addressing the substance, we need to determine the standard of review. Judlau, citing to *Price v. Philip Morris, Inc.*, 219 Ill. 2d 182, 236 (2005), maintains that we should employ a *de novo* standard of review because the record consists entirely of written communications and the CPO

did not need to evaluate the credibility of witnesses or weigh conflicting testimony. However, when reviewing a case pursuant to a common law writ of *certiorari*, just as when reviewing a case under Administrative Review Law, the factual findings and conclusions of the administrative agency are considered *prima facie* true and correct, and courts are limited to reviewing whether the findings are against the manifest weight of the evidence. That said, even if we were to employ a *de novo* standard of review, the outcome would not change.

¶ 39    The CDA's June 26, 2017 letter informed Judlau that the "issue at hand" was a "union disagreement with a sub-contractor hired by Judlau" and cited "the current legal case between Local 786 and Local 731 and the involvement of [Local 150] in the issue ***." By this time, Judlau had known about Local 150's grievance for a month, which was a grievance regarding a subcontractor hired by Judlau that employed members of Local 786. It strains credulity to believe that the CDA's letter did not alert Judlau as to the exact nature of the CDA's concern. And, if there were any doubt, the CDA sent a follow up letter on June 28, 2017, in which it clearly stated that the issue was [t]he grievances filed by Local 150 on May 26, 2017 ***." Judlau's claims that the CDA's letters were "no paragon[s] of clarity" is not persuasive. We also find unpersuasive Judlau's argument that the CDA should be found at fault for ignoring its request for a meeting. It is unclear what Judlau thinks would have been achieved through meeting that could not have been achieved via letter. The CDA made it clear enough that it had concerns regarding Judlau's handling of Local 150's grievance and Judlau chose not to offer any details or explanation as to how it was proceeding to alleviate those concerns. Accordingly, we conclude the CPO's determination that Judlau's failure to communicate caused the continued suspension of work after June 26, 2017, was not against the manifest weight of the evidence.

¶ 40 The last argument Judlau raised with regard to this issue is that the CPO erred when it conflated a grievance filed under the MARBA Agreement and a jurisdictional dispute under the PLA. According to Judlau, "[a] subcontracting grievance is distinct and independent of a jurisdictional claim ***." However, Judlau is incorrect in stating that the CPO held that Local 150's grievance was a jurisdictional dispute that should have been resolved via the PLA's dispute resolution provisions. Rather, the CPO only ever referred to the fact that the CDA's position was that the grievance should have been resolved in that manner. Where the CPO found fault in Judlau's behavior was its failure to provide the CDA with any information regarding that dispute once it learned of the CDA's concerns. As we read the CPO's decision, it was this failure to communicate with the CDA regarding an *arguable* violation of the PLA that the CPO concluded was the act or omission that caused the continued suspension of work. As mentioned earlier, the CPO's conclusions in this regard were not against the manifest weight of the evidence.

¶ 41 Judlau's remaining issue on appeal is that the CPO erred when she found that it was not entitled to a 21-day extension of time. Specifically, Judlau argues that the CPO misread the Contract as requiring it to prove that the delay was due to causes beyond its reasonable control, such as acts of God. Judlau insists that it only needed to prove that it was delayed in the prosecution and completion of its work by an act of the CDA that was not due to any fault, neglect, act or omission on its part.

¶ 42 The relevant portion of the Contract states the following:

"If the Contractor is delayed in the commencement, prosecution or completion of the Work by any act of the City, including but not limited to a delay, change, addition, deletion or modification in the Work or any omission, neglect or default of the City, or by

order of the Commissioner, or the Commissioner's designee, or by any cause beyond the Contractor's control, none of which are due to any fault, neglect, act or omission on Contractor's part, then the Contractor shall be entitled solely and exclusively to an extension of time only."

¶ 43    Judlau is correct that the Contract does not require it to prove an act of God to be entitled to an extension of time; however, its argument in this regard fails for the same reasons as its argument for why it was entitled to costs related to the suspension of work. In other words, the delay in construction that occurred after work was suspended was due to an act or omission by Judlau; namely, its failure to communicate with the CDA regarding Local 150's grievance. Accordingly, the CPO's finding that Judlau was not entitled to an extension of time under the Contract is not clearly erroneous.

¶ 44    For these reasons, we affirm the circuit court of Cook County's order denying Judlau's common law writ of *certiorari* and affirming the CPO's decision.

¶ 45    Affirmed.